Ernest LEWIS, et al., Plaintiffs,

v.

**TUSCAN DAIRY FARMS, INC. and Willie Whelan, as President of Local 584, International Brotherhood of Teamsters, Defendants.**

**No. 87 Civ. 7607 (MBM).**

United States District Court,
S.D. New York.

Aug. 30, 1993.

---

Louie Nikolaidis, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., New York City, for plaintiffs.

Richard Naness, Clifford Chaiet, Carmelo Grimaldi, Kaufman Naness Schneider & Rosensweig, P.C., Melville, NY, for defendant Tuscan Dairy Farms, Inc.

John Driscoll, Driscoll & Delaney, New York City, for defendant Whelan.

## OPINION AND ORDER

MUKASEY, District Judge.

In a prior Opinion and Order, reported at 752 F.Supp. 116 (S.D.N.Y.1990) (the "1990 opinion"), familiarity with which is assumed for current purposes, I found that defendant William Whelan, sued as president of Local 584, International Brotherhood of Teamsters, had violated the duty of fairly representing plaintiffs, that defendant Tuscan Dairy Farms, Inc. had breached a contractual obligation to dovetail plaintiffs' seniority with the seniority of employees at Tuscan's Lindenhurst and Woodside plants, and that both defendants were liable to plaintiffs as a result. On appeal *sub nom. Alier v. Tuscan Dairy Farms, Inc.,* 979 F.2d 946 (2d Cir. 1992), the Court of Appeals remanded the case for further consideration in light of *Air Line Pilots Association, International v. O'Neill,* 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991), decided after the opinion on liability in this case. The immediately relevant portion of the Court of Appeals opinion is as follows:

> In March 1991, a few months after the district court's liability decision, the Supreme Court decided *Air Line Pilots Association, International v. O'Neill,* [499] U.S. [65], 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991),

clarifying the standard to be applied to fair representation claims against a union:

> > We hold that the rule announced in *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967)—that a union breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith'—applies to all union activity, including contract negotiation. We further hold that a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 ... (1953), as to be irrational. [499] U.S. at [67], 111 S.Ct. at 1130.

> Since the district court may have applied a standard different from that established by *O'Neill,* we vacate the judgment and remand in order to permit the court to consider the issues in light of the *O'Neill* standard. We of course express no view as to the merits.

979 F.2d 948. For the reasons set forth below, when the *O'Neill* standard is applied to the facts of this case, as set forth in the 1990 opinion, the union's actions were arbitrary. Further, the facts found in the 1990 opinion show also that the union's actions were taken in bad faith. Accordingly, the liability determination in the 1990 opinion will stand.

## I.

The 1990 opinion found that Whelan had received advice from his lawyer in late May or early June of 1987 that he was free to modify or ignore General Rule IV C of the agreement, which required that the seniority of workers at a closed plant be dovetailed with the seniority of workers at a plant to which production from the closed plant was transferred, if Whelan found that modifying or ignoring such a rule would promote the interest of the general membership. 752 F.Supp. at 118–19. Whelan was up for reelection in 1987 and was reluctant to risk the anger of the 200 men at Tuscan's Lindenhurst and Woodside plants in order to help

the 100 or so at the Ozone Park plant who would benefit from the dovetailing of their seniority at the Tuscan plants. *Id.* at 118. Moreover, as the 1990 opinion also found, Whelan was anxious that Tuscan pay the unfunded liability under the Employee Retirement Income Security Act of 1974 for employees who had retired from the Ozone Park plant, and believed that payment would not be forthcoming as quickly if Tuscan were required to hire the Ozone Park employees as it would if no such requirement were imposed. *Id.* at 120. Accordingly, as the 1990 opinion found, Whelan decided even before he knew the terms of the Tuscan–Liberty Farms deal that he would not press the rights of the Ozone Park employees under Rule IV C, regardless of what the contract required. *Id.* at 119. Whelan's decision did not come in response to any crisis of the moment. It was made after Whelan's conversation with his lawyer in late May or early June of 1987, weeks before the Tuscan–Liberty Farms deal was closed and about two months before the Ozone Park plant closed at the end of July. *Id.* at 119, 120. Further, Whelan then misled the Ozone Park employees by concealing his knowledge that the plant would be closed and, contrary to his testimony at trial, did not encourage senior workers at Ozone Park to leave before the plant was closed but rather encouraged them to stay. *Id.* at 119–20.

## II.

Although the Supreme Court in *O'Neill* articulated a broadly deferential standard for lower courts to use when assessing the arbitrariness of challenged union conduct—"union's behavior is so far outside a 'wide range of reasonableness' [citation omitted] as to be irrational" *O'Neill*, 499 U.S. at 67, 111 S.Ct. at 1130—the Court also made clear that that standard is not abstract but contextual; the challenged conduct must be considered "in light of the factual and legal landscape at the time of the union's actions." *Id.* The dominant topographic feature of that landscape at the time of Whelan's actions in this case was Rule IV C of the contract, which dealt specifically with the seniority rights of employees when the plant at which they work is closed and its production is transferred to other plants. It is in that context that Whelan's actions must be evaluated.

Certainly, in a purely abstract setting, Whelan's course of conduct, whatever its conflict with the contract, was not "irrational." Whelan could have decided rationally that the interests of the Ozone Park employees had to be sacrificed in the interest of harmony and that renegotiating the contract to achieve that result, even though such renegotiation had taken place successfully in the past in response to a perceived crisis, 752 F.Supp. at 117, would involve more trouble and risk of failure than it was worth. Moreover, if such a decision were otherwise permissible, that Whelan may also have had a selfish interest in his own reelection would not necessarily invalidate the decision, so long as the decision also furthered a legitimate union objective. In *Rakestraw v. United Airlines, Inc.,* 981 F.2d 1524 (7th Cir. 1992) (Easterbrook, J.), the Seventh Circuit, decided challenges to two separate contracts negotiated by the Airline Pilots Association, one following the acquisition of one airline by another and the second following a strike in which the airline had hired replacements. In the former case the pilots of the acquired carrier claimed the union had committed an unfair labor practice by not negotiating in their behalf for bonus seniority so that when the seniority lists of the two airlines were dovetailed they would not be disproportionately disadvantaged. In the second case pilots hired as permanent replacements during the strike claimed the union had taken out its animosity against them by permitting the seniority of other pilots to include training time with the result that those other pilots forced out pilots hired as permanent replacements during the strike. 981 F.2d at 1525–26. The Court in *Rakestraw* applied an analogy drawn in *O'Neill* between a union's choice of which workers to favor and a legislature's choice of which constituents to favor, as follows:

> Slapping the label 'bad faith' or 'discrimination' on a classification that is rationally related to a legitimate objective does not alter the analysis. A discriminatory motive without a discriminatory rule does not condemn a statute. *Palmer v. Thompson,*

403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); cf. *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (rule rationally related to legitimate objective not spoiled by religious motivation of some sponsors). Knowledge that some groups gain or lose as a result of a rule does not even amount to a discriminatory motive. *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). 981 F.2d at 1532. Thus, if the legislative analogy drawn in *O'Neill* and applied in *Rakestraw* were applied here as well, Whelan's conduct could well be regarded as rational and therefore permissible.

But to apply that analogy uncritically here would be to disregard the Court's own admonition to assess rationality based on "the factual and legal landscape at the time of the union's actions." A union cannot be regarded as free to act in every instance as a legislature would, because that would mean necessarily that no contract could survive the perceived exigencies of the moment. In *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), one of the leading cases defining the duty of fair representation and one that provided substantial underpinning for *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), in turn relied on heavily in *O'Neill, see O'Neill,* 499 U.S. at 67, 76–78, 111 S.Ct. at 1130, 1135, the Supreme Court measured the union's duty against the requirements of the contract there at issue, 375 U.S. at 345–48, 84 S.Ct. at 369–71, and made it explicit that a different problem would have been presented if the relevant section "had been omitted from the contract or if the parties had acted to amend the provision." 375 U.S. at 345 n. 7, 84 S.Ct. at 369 n. 7. The law of our own Circuit is that union officers are at risk of violating the duty of fair representation when they decide an issue on their own and do not go to the membership with that issue when they should, or even fail to maintain procedures to assure that they do not commit such unauthorized acts. *Kozera v. Westchester–Fairfield Elec. Contractors,* 909 F.2d 48, 54–55 (2d Cir.1990). That suggests strongly that a

union is not free to do what Whelan was told by his lawyer he could do here—disregard the contract so long as he thought he was acting in the best interests of the membership at large, without renegotiating the contract and submitting it to a vote. Such broad freedom for a union to disregard a contract whenever it seems reasonable to the union leadership to do so would make pointless the duty imposed on union officers by § 104 of the Landrum–Griffin Act, "to forward copy of each collective bargaining agreement made by such labor organization with any employer to any employee whose rights are directly affected by such agreement...." 29 U.S.C. § 414. The obvious goal of that section is the same as the goal of the duty of fair representation itself: to give union members an "effective means of protecting their own interests." *DelCostello v. Int'l. Bhd. of Teamsters,* 462 U.S. 151, 164 n. 14, 103 S.Ct. 2281, 2290 n. 14, 76 L.Ed.2d 476 (1983).

In order to apply abstract notions of rationality here I would have to believe that the Supreme Court in *O'Neill* read that section into irrelevance and left union leaders free to break to the hope contractual promises made to the ear[1] so long as the sacrifice accords with their perception of the greatest good for the greatest number.

*O'Neill* need not be read so broadly. Both *O'Neill* and *Rakestraw* involved renegotiation of a contract and not application of an existing contract, and there is some authority for the proposition that despite the breadth of the language in *O'Neill*—"all union activity, including contract negotiation"—its standard does not necessarily apply to a union's decision to disregard an existing contract to the detriment of a group of its members. In *Aguinaga v. United Food & Com. Workers Intern.,* 993 F.2d 1463 (10th Cir.1993), the Tenth Circuit upheld a decision that a union had violated its duty of fair representation when it entered into an undisclosed agreement with an employer permitting the employer to close one of its plant and then reopen it months later as a non-union facility, in violation of an existing contract and without permitting the union employees at the plant to pursue a grievance based on that

---

1. W. Shakespeare, *Macbeth,* Act V, Scene 7.

contract. That Court distinguished *O'Neill* as follows:

> [U]nlike *O'Neill*, this is not a case where union members are suing their union for its failure to strike a better deal through collective bargaining. *See O'Neill*, 499 U.S. at 67–72, 111 S.Ct. at 1130–32. Rather this case involves the primary concern that the duty of fair representation was designed to address—*i.e.*, the concern that individual employees not be deprived of all effective means of protecting their own interests. *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 164 n. 14, 103 S.Ct. 2281, 2291 n. 14, 76 L.Ed.2d 476 (1983). Here, the Union not only failed to protect Plaintiffs' interests, it bartered away Plaintiffs' means of protecting themselves and left Plaintiffs without representation. Such deliberate abandonment of Plaintiffs' interests constitutes wrongdoing on the part of the Union, *see Bennett v. Local Union No. 66*, 958 F.2d 1429, 1437–38 (7th Cir.1992), and the record contains sufficient evidence to find that this activity was irrational in light of the surrounding climate.

993 F.2d at 1471. The Court then went on to find that the union's attempts to conceal its conduct also supported a finding of bad faith. *Id.*

That reasoning fits this case as well. Here, Whelan decided based on advice from the union's lawyer that despite the terms of the contract, he was free to decide himself what suited the interests of the union as a whole, and then act on that decision. Notably, the "surrounding climate" here, *id.*, presented no need for an immediate decision, nor was it "an emergency situation not really envisaged in the collective bargaining agreements." *Ryan v. New York Newspaper Printing, Etc.*, 590 F.2d 451, 456 (2d Cir. 1979). Whelan had weeks in which to seek approval for his proposed change in how the parties would address a situation that was envisaged and precisely treated in the collective bargaining agreement.

Accordingly, even under the broadly phrased *O'Neill* standard applied to a union's disregard of an existing contract, the union's conduct here was arbitrary.

### III.

Moreover, at the risk of practicing the kind of epithetical jurisprudence condemned by the Seventh Circuit in *Rakestraw*, it appears that Whelan's conduct—talking around the issue and misleading union members as to what was going to happen at Ozone Park, 752 F.Supp. at 120, and failing to take plaintiff Ernest Lewis's grievance to the executive committee or to the general membership, *id.* at 121—also constitutes strong evidence of bad faith. *See Bennett v. Local Union No. 66*, 958 F.2d 1429, 1439 (7th Cir.1992) (union's misinformation to an employee and failure to correct that misinformation was held to show bad faith and intentional misconduct).

### IV.

■ Although neither side has briefed or argued the issue, the question remains whether Whelan can be absolved of violating the duty of fair representation by his reliance on the erroneous advice of counsel. The only authority I have found on that subject holds that he can not, *Gregg v. Chauffeurs, Teamsters & Helpers Local 150*, 699 F.2d 1015, 1016 (9th Cir.1983), a rule that makes sense and one I choose to follow because the alternative is laden with possibilities for abuse.

For the above reasons, the finding of liability in the 1990 opinion will stand.

SO ORDERED.