Ernest LEWIS, et al., Plaintiffs–
Appellees,

v.

TUSCAN DAIRY FARMS, INC. and Willie
Whelan, as President of Local 584, In-
ternational Brotherhood of Teamsters,
Defendants–Appellants.

Nos. 1404, 1405, Dockets 93–9188, 93–9190.

United States Court of Appeals,
Second Circuit.

Argued April 11, 1994.

Decided June 7, 1994.

Richard M. Naness, Melville, NY (Kaufman, Naness, Schneider & Rosensweig, P.C., Clifford P. Chaiet, Carmelo Grimaldi, of counsel), for defendant-appellant Tuscan Dairy Farms, Inc.

John T. Driscoll, New York City (Driscoll & Delaney, of counsel), for defendant-appellant Willie Whelan, as President of Local 584, Intern. Broth. of Teamsters.

Louie Nikolaidis, New York City (Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., Daniel E. Clifton, Lauren Esposito, of counsel), for plaintiffs-appellees.

Before: FEINBERG, MINER and JACOBS, Circuit Judges.

FEINBERG, Circuit Judge:

Defendant-appellant Local 584, International Brotherhood of Teamsters (Union), was the collective bargaining representative of plaintiffs-appellees, former workers at the Liberty Farms, Inc., milk processing plant in Ozone Park, New York, under the multi-employer Milk Industry Collective Bargaining Agreement (Agreement). In 1990, the United States District Court for the Southern District of New York, Michael B. Mukasey, J., found after a four-day bench trial that defendant-appellant Tuscan Dairy Farms, Inc. (Tuscan), which purchased the plant in 1987, had breached its obligation under the Agreement to dovetail the seniority of plaintiffs with the seniority of employees at two other Tuscan plants. *Lewis v. Tuscan Dairy Farms,* 752 F.Supp. 116 (S.D.N.Y.1990) (*Lewis I*). The court further found that the Union, through the actions of its president, Willie Whelan, had violated its duty of fair representation of plaintiffs. *Id.* The court held Tuscan and the Union jointly and severally liable for damages of some $5.3 million in back pay, pension benefits, severance pay and fringe benefits.

On the appeal by Tuscan and the Union from the judgment in *Lewis I*, we remanded the case for reconsideration in light of the Supreme Court's opinion in *Air Line Pilots Association v. O'Neill,* 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). *Alier v. Tuscan Dairy Farms,* 979 F.2d 946 (2d Cir.1992) (per curiam). On remand, the district court confirmed its 1990 decision in an opinion and order dated August 30, 1993. *Lewis v. Tuscan Dairy Farms,* 829 F.Supp. 665 (*Lewis II*). Tuscan and Whelan again appeal. For reasons set forth below, on the Union's appeal we affirm, and on Tuscan's appeal we vacate and remand for further proceedings.

## I. Background

The milk industry in New York State went through a "period of upheaval" following a January 1987 decision of the United States District Court for the Eastern District of New York, which declared unconstitutional New York's restrictions on the distribution of milk coming from outside the state. *Farmland Dairies v. Commissioner of New York*

*State Dept. of Agric. and Markets,* 650 F.Supp. 939. Shortly after that decision, Whelan began meeting with Jules Kotcher, owner of Liberty Farms and several other milk processing and distributing companies, and Louis Caiola, president of Tuscan, to discuss Tuscan's possible purchase of Kotcher's operations, including the Ozone Park plant. Whelan supported the purchase "because he believed Kotcher did not have the resources or the will to compete with Farmland [Dairies]," a major out-of-state competitor. *Lewis I,* 752 F.Supp. at 118.

By February 1987, rumors of an impending sale were circulating around the Ozone Park plant. The rumors were discussed at Union meetings, but Whelan "provided no definite information to the members as to whether a sale was imminent." *Id.* Plaintiffs, who were utility workers at Ozone Park,[1] were concerned about their rights should Tuscan shift production from the Ozone Park plant to Tuscan's other facilities. General Rule IV C of the Agreement required an employer to dovetail seniority lists when it merges or consolidates facilities:

> In all consolidations of branches or plants, company craft group seniority shall prevail for the purpose of layoffs, vacations, bidding and in all other usual respects.
>
> *If the Employer acquires all or any part of a milk business ... and merges or consolidates the same with its own business,* or handles the same in any other manner, ... the Employer shall be required to assume responsibility for the employment of the employees who elect to or who are transferred to the new Employer as provided herein *who shall enjoy craft group seniority, on the basis of the period of employment in the business acquired* for the purpose of layoffs, vacations, bidding and in all other usual respects. (Emphasis supplied).

Union counsel John Driscoll testified at trial that he had advised Whelan that even if Rule IV C required the dovetailing of seniority, " '[Whelan] had the power to modify that

or to ignore that if he thought it necessary in order to promote the interest of the general membership.' " *Lewis I,* 752 F.Supp. at 119. Under the Union's bylaws, however, amendments to collective bargaining agreements require meeting with Union membership to discuss demands, approval by the Union's Joint Council and Area Conference before submission to the employer and, finally, ratification by vote of the membership. Whelan testified to his understanding that although the Union may not modify a provision of the Agreement without ratification, the Union may simply ignore provisions of the Agreement without modifying them.

Thus, without following the modification procedure outlined in the Union's bylaws, Whelan and Caiola "apparently worked out an ad hoc arrangement which Whelan felt empowered to implement." *Id.* Even before the precise terms of the Tuscan–Kotcher deal had been set, Whelan assured Caiola that the Union would not seek a merger of the seniority lists under Rule IV C. *Id.* Whelan concealed this fact from Ozone Park employees. In fact, he told them if Tuscan bought the plant's equipment or paid Kotcher's unfunded liability under the Employee Retirement Income Security Act (ERISA), such action would constitute a merger requiring the dovetailing of seniority under Rule IV C. He also encouraged Ozone Park employees to stay on the job and told them that if they were to leave, they would be denied Union work cards allowing them to find work elsewhere. *Id.* at 119–20.

Whelan also told two Ozone Park workers that because he was running for reelection that year, he was hesitant to merge the Ozone Park seniority list with those of the two other Tuscan plants that would assume the Ozone Park plant's functions after the sale. To do so would risk alienating over 200 Tuscan workers to please 100 or so Ozone Park workers, who were relatively senior. In addition, Whelan was trying to obtain from Tuscan a $2.5 million payment to cover Kotcher's unfunded pension fund liability under ERISA.

---

1. The Union represents various categories of milk industry workers, including utility workers, who work inside processing and distributing facilities and make some supplemental milk deliveries, and route drivers, who deliver milk along regular routes.

In June 1987, Tuscan and Kotcher signed a series of agreements under which Tuscan would buy Kotcher's plants. Tuscan also agreed to indemnify Kotcher for all unfunded ERISA liability. Id. at 117. On July 20, 1987, Tuscan bought the Ozone Park plant and shut it down, transferring most of its production and 75% of its processing equipment to Tuscan plants in Lindenhurst, New York and Woodside, New York, also covered by the Agreement. Some displaced Ozone Park employees found work at these two plants, but only at the bottom of the seniority list. If the seniority lists had been merged, it was likely that all of the approximately 110 displaced Ozone Park employees could have been employed at the two plants. Id. at 120.

Four days after the Ozone Park plant closed, plaintiff-appellee Ernest "Buddy" Lewis sent a letter to Whelan demanding that the seniority lists be merged under Rule IV C. Lewis, the plant's former shop steward, was "a frequent antagonist of Whelan and aggressive in protecting the interests of his constituents." Id. Whelan understood Lewis's letter to be a demand that the issue be submitted to arbitration. According to usual Union procedure, such a demand is voted on by the Union's executive committee and its membership. Whelan, however, failed to bring Lewis's demand before either the executive committee or the membership.

Thereafter, plaintiffs brought this suit, invoking jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and under 28 U.S.C. §§ 1331 & 1337. As indicated above, this appeal now comes to us after Judge Mukasey's decision in *Lewis I*, our remand and the judge's decision in *Lewis II*.

## II. Discussion

### 1. Recusal

■ The Union argues that Judge Mukasey should have recused himself from the case on grounds of personal bias under 28 U.S.C. §§ 144 and 455(b)(1).[2] This contention is based on an unrelated proceeding that took place shortly before the trial in this case. In that proceeding, Judge Mukasey found Whelan's testimony not credible and ordered him imprisoned for contempt of court for refusing to order striking union members back to work. *Dellwood Foods, Inc. v. Local 584, Int'l Bhd. of Teamsters,* 89 Civ. 4635 (S.D.N.Y.1989). According to the Union, that order casts doubt upon the judge's ability to be impartial in the present case.

■ We reject this argument. A motion for recusal requires a showing of personal bias. Ordinarily, such a showing must be based on "extrajudicial conduct ... not conduct which arises in a judicial context." *Apple v. Jewish Hosp. and Medical Ctr.,* 829 F.2d 326, 333 (2d Cir.1987) (citing *In re International Business Machines Corp.,* 618 F.2d 923, 928 (2d Cir.1980)). The Union points to no extra-judicial conduct by Judge Mukasey. It is true that "[t]here may be instances in which a judge's behavior during prior judicial proceedings can demonstrate sufficient friction between the judge and the complaining party to support a finding of bias." *United States v. Daley,* 564 F.2d 645, 651 (2d Cir.1977), cert. denied, 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978). The Union, however, points to no conduct at all in either proceeding, except that Judge Mukasey ruled against Whelan in *Dellwood Foods.* This is insufficient by itself to show personal bias. Id.

### 2. The Union's breach of the duty of fair representation

■ After the district court in *Lewis I* found that the Union, by Whelan's actions, had breached its duty of fair representation, but before we heard the first appeal in this case, the Supreme Court clarified the stan-

---

**2.** 28 U.S.C. § 144 provides in relevant part:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no

further therein, but another judge shall be assigned to hear such proceeding.

28 U.S.C. § 455(b)(1) provides in relevant part:

[A judge] shall ... disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party.

dard for analyzing an alleged breach of the duty of fair representation:

> We hold that the rule announced in *Vaca v. Sipes*, 386 U.S. 171, 190 [87 S.Ct. 903, 916–17, 17 L.Ed.2d 842] (1967)—that a union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith"—applies to all union activity, including contract negotiation. We further hold that a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness," *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 [73 S.Ct. 681, 686, 97 L.Ed. 1048] (1953), as to be irrational.

*O'Neill*, 499 U.S. at 67, 111 S.Ct. at 1130. Thus, we remanded to give the district court an opportunity to apply this standard. *Alier v. Tuscan*, 979 F.2d at 948. On remand, the district court held Whelan's actions were arbitrary under *O'Neill* and that he acted in bad faith. *Lewis II*, 829 F.Supp. at 666, 669.

In *O'Neill*, the Court reversed a finding that a union had breached the duty of fair representation where it turned out in retrospect that the union had agreed to a bad settlement. 499 U.S. at 79, 111 S.Ct. at 1136. The suit in this case, however, does not involve employee dissatisfaction with the end product of negotiation. Rather, this suit involves "the primary concern that the duty of fair representation was designed to address—*i.e.*, the concern that individual employees not be deprived of all effective means of protecting their own interests." *Aguinaga v. United Food & Comm. Workers Int'l Union*, 993 F.2d 1463, 1471 (10th Cir.1993) (citing DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164 n. 14 (1983)). In *Aguinaga*, the Tenth Circuit upheld a finding of a violation of the duty of fair representation where a union made a secret agreement with an employer allowing the employer to shut down a plant and reopen it as a non-union facility, in violation of the collective bargaining agreement and without allowing union employees to pursue a grievance against the employer. In the present case, as in *Aguinaga*, "the Union not only failed to protect Plaintiffs' interests, it bartered away Plain-

tiffs' means of protecting themselves and left Plaintiffs without representation." Id.

The Union argues that the district court interpreted the *O'Neill* standard too narrowly and that Whelan's actions were not irrational in view of the entire "factual and legal landscape at the time." The Union claims that Whelan made a rational decision in the best interests of the Union membership as a whole. As the district court found, a $2.5 million payment by Tuscan to cover Kotcher's unfunded pension plan liability for the Ozone Park employees "would not have been forthcoming as quickly" without the Union's agreement not to apply Rule IV C. *Lewis I*, 752 F.Supp. at 120. The Union further argues that Tuscan would not even have considered purchasing the Kotcher plants unless the Union agreed that Rule IV C would not apply; in that case, the Kotcher plants would have eventually closed and a substantial number of Union jobs would have been lost.

However, whether Tuscan would have backed away from the purchase without the "deal" with Whelan is questionable. Plaintiffs claim that Tuscan signed a letter of intent to purchase the Kotcher plants *before* the alleged commitment from Whelan. Moreover, the district court did not find in either *Lewis I* or *Lewis II* that Tuscan insisted on the agreement as a precondition to negotiations with Kotcher. Judge Mukasey stated only that "Whelan and Caiola of Tuscan apparently worked out an ad hoc arrangement" not to apply Rule IV C. *Lewis I*, 752 F.Supp. at 119. In a brief, unpublished opinion in August 1991, dealing with joint and several liability, the judge also stated that Whelan and Caiola "had agreed that Tuscan would go through with the purchase of Liberty Farms if the union did not press a merger of the Ozone Park seniority list."

More significantly, even if Whelan did have practical justifications for the oral agreement, this would not insulate the Union from liability in the circumstances of this case. Whether or not he acted arbitrarily, Whelan acted in bad faith, in violation of the duty of fair representation, by willfully concealing the oral agreement from Union members. Before Tuscan bought the Kotcher plants, Whelan represented to workers that such a

purchase might require dovetailing under Rule IV C depending upon the way the purchase was legally structured. But, because a deal had been made with Tuscan's president, Whelan never followed through to find out the precise form of the purchase. Moreover, Whelan encouraged Ozone Park employees not to "jump ship" and leave their jobs. Whelan disputes these findings by the district court, but on the record before us we cannot say they are clearly erroneous.

Even if Whelan's agreement with Tuscan had been legitimate, he could not justify deliberately misrepresenting to employees a change in their rights guaranteed under the collective bargaining agreement. No "'range of reasonableness,'" O'Neill, 499 U.S. at 67, 111 S.Ct. at 1130, can encompass such conduct by a union official. In similar circumstances, the Seventh Circuit has held:

> There is an important distinction between a negotiated modification of an agreement's terms and an unstated "modification" intended to apply only to selected individuals: we call the latter a "breach."

*Bennett v. Local Union No. 66, Glass Workers Int'l Union,* 958 F.2d 1429, 1435 (7th Cir.1992). As in *Bennett,* the Union here took no steps to obtain a proper modification of the Agreement; there was only a secret agreement intended to affect only certain workers. In *Bennett,* "the Union told [the employee] that she was non-probationary and that it would represent her, [but] then agreed [with the employer] that she was probationary and refused to represent her and it then failed to inform her of her change in status." *Bennett,* 958 F.2d at 1439. Similarly, in this case Whelan told the Ozone Park employees that seniority should be dovetailed if Tuscan bought the plant, but secretly agreed with Tuscan not to dovetail and concealed that agreement from the employees. Moreover, Union bylaws require approval and ratification prior to any modification of the collective bargaining agreement. Whelan did not comply with these procedures.

The Union argues that the district court failed to consider the effect of the incursion of out-of-state milk producers in the wake of the *Farmland Dairies* decision. In light of the extreme pressures placed on the industry, the Union claims, Whelan was justified in waiving Rule IV C in order to induce Tuscan to buy the Kotcher plants and prevent the loss of Union jobs. The Union argues that a union may modify or even abrogate seniority rights under a collective bargaining agreement without seeking ratification when it faces "emergency situations not envisaged in the Collective Bargaining Agreement." According to the Union, a court should defer to the union leadership's discretion when it determines "that it must act promptly and aggressively in order to maximize its membership's interests." *Famulare v. United Transp. Union Int'l,* 639 F.Supp. 965, 970 (S.D.N.Y.1986).

The district court considered and rejected this argument. The judge found, and we agree, that no emergency situation existed. Even if Whelan had reasonably, but incorrectly, believed that he was making a contract modification under emergency conditions when he made his oral agreement with Caiola, he "had weeks [thereafter] in which to seek approval for his proposed change in how the parties would address a situation that was envisaged and precisely treated in the collective bargaining agreement." *Lewis II,* 829 F.Supp. at 669. Rather than seeking approval, however, he concealed the agreement from the membership.

Finally, after the Ozone Park plant closed, Whelan violated standard union procedure by failing to present Lewis's demand for arbitration of the Rule IV C issue to the Union's executive committee or to its membership. Although a union's duty of fair representation does not require it to take every employee grievance to arbitration, "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." *Vaca v. Sipes,* 386 U.S. at 191, 87 S.Ct. at 917. As noted below, we accept the district court's view that Rule IV C, as written, required the merging of seniority lists in this case. Thus, Lewis obviously had a meritorious grievance. In this court, the Union does not take issue with the district court's factual finding that Whelan failed to follow standard procedures for processing Lewis's demand for arbitration. We agree with the district court that

this conduct "constitutes strong evidence of bad faith." *Lewis II*, 829 F.Supp. at 669. From the record, it appears that Whelan deliberately refused to process Lewis's meritorious demand because of Whelan's oral agreement with Tuscan.

In sum, we affirm the district court's holding that the Union, by the actions of its president, breached its duty of fair representation to plaintiffs.

3. Tuscan's liability for breach of the Agreement

■ We must still determine, however, whether the district court erred, as Tuscan urges, when it held that Tuscan breached the Agreement.

The district court found that Rule IV C required the merging of seniority lists under the circumstances of this case. Rule IV C requires such merging of seniority

> [i]f the Employer acquires all or any part of a milk business ... and merges or consolidates the same with its own business, or handles the same in any other manner[.]

The present case involved a merger or consolidation as contemplated by Rule IV C. As the district court found, "the overwhelming bulk of both the equipment and the production was transferred to Tuscan's Lindenhurst and Woodside plants, both of whose employees are represented by Local 584." 752 F.Supp. at 123.

Tuscan and the Union, citing two 1974 arbitration decisions involving the Union and other employers also covered by the Agreement, argue that Rule IV C does not apply to the Tuscan–Kotcher deal. The district court held, however, that those decisions are distinguishable. In one—*In re Local 584* and *Delltown Foods, Inc.,*—80 percent of production of the closed plant was moved into the jurisdiction of a different union that was not subject to the Agreement, unlike the present case, where Tuscan transferred most of Ozone Park's production and equipment to facilities within Local 584's jurisdiction. In the other—*In re Local 584* and *Honeywell Farms, Inc.,*—the employer shut down its milk bottling plant for economic reasons and

subcontracted its bottling operations to another company. The arbitrator found that the subcontracting did not constitute a merger or consolidation within the meaning of Rule IV C.

■ On this record, we cannot say that the district court erred in holding that Rule IV C applied, as written, to the Tuscan–Kotcher deal. Tuscan argues, however, that this is not the end of the matter. It contends that it is not liable for breach of contract because the Agreement was effectively modified by the oral agreement between Caiola, Tuscan's president, and Whelan, the Union's president. Tuscan also argues that, at the very least, it was entitled to rely on Whelan's apparent authority to modify Rule IV C on behalf of the Union. Tuscan vigorously contends that it would not have invested many millions of dollars—including the $2.5 million for Kotcher's ERISA liability—unless Tuscan reasonably thought that the arrangement on seniority was authorized. Tuscan cites a number of cases in support of its legal propositions, including one from this court—*Kozera v. Westchester–Fairfield Chapter of Nat'l Elec. Contractors Ass'n*, 909 F.2d 48 (2d Cir. 1990), *cert. denied*, 498 U.S. 1084, 111 S.Ct. 956, 112 L.Ed.2d 1044 (1991)—and others from other courts of appeals. E.g., *Moreau v. Local Union No. 247, Int'l Bhd. of Firemen & Oilers*, 851 F.2d 516 (1st Cir.1988), *NLRB v. Truckdrivers Local Union No. 100*, 532 F.2d 569, 571 (6th Cir.), *cert. denied*, 429 U.S. 859, 97 S.Ct. 160, 50 L.Ed.2d 137 (1976).

On the facts, plaintiffs respond that Tuscan was a member of the Greater New York Milk Dealers Labor Committee, the signatory to the Agreement for the employers, at the time of the Kotcher buyout; thus, Tuscan was aware of the procedures that Whelan ignored and that the Agreement is a multiemployer agreement that no single employer may modify. On the law, plaintiffs cite a number of decisions strongly condemning secret, unratified union-employee agreements. E.g., *Bennett*, 958 F.2d at 1435; *Merk v. Jewel Food Stores*, 945 F.2d 889, 893–96, 899 (7th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992).

The district court apparently did not directly address these issues, undoubtedly be-

cause Tuscan's arguments on this aspect of the case are much more focused in this court than they were in the district court. The district court did find, as noted above, that "Whelan and Caiola of Tuscan apparently worked out an ad hoc arrangement which Whelan ·felt empowered to implement." *Lewis I*, 752 F.Supp. at 119. The court also found, in its August 1991 opinion regarding the apportionment of damages

> ... union president Willie Whelan and Tuscan's president Louis Caiola had agreed that Tuscan would go through with the purchase of Liberty Farms if the union did not press a merger of the Ozone Park seniority list into the Lindenhurst and Woodside seniority lists.

Further, in this court's opinion remanding this case on the appeal in *Lewis I*, we noted

> Tuscan purchased Liberty after entering into an agreement with Local 584's president that the Union would not press for a merger of the Ozone Park seniority list into Tuscan's Lindenhurst and Woodside seniority lists.

979 F.2d at 948.

The issues thus posed by Tuscan are not insubstantial. In *Kozera*, we noted that an amendment to a multiemployer labor agreement "had not been ratified by the membership" and then concluded

> even though the [amendment] had not been ratified by the membership, we conclude that, notwithstanding the issue of the duty of fair representation and disclosure owed by the [union] president and manager to the membership, the [employer] could reasonably believe that officers of the [union] had authority ... to bind the union membership.

909 F.2d at 54 (citing cases). Tuscan relies on *Kozera* and the cases there cited, as well as on language in the opinions in *Moreau*, 851 F.2d at 520, and in *NLRB v. Local 100*, 532 F.2d at 871. We by no means suggest, however, that these cases are controlling here. Not only may they be distinguishable, but the cases on which plaintiffs rely contain powerful condemnation of secret agreements.

Under all the circumstances, we believe it advisable to remand this aspect of the case to the district court. Thereafter, on this record or on an expanded record in the district court's discretion, it should address the issues raised by Tuscan's arguments that the Agreement was orally amended and that, in any event, it was entitled to rely on Whelan's apparent authority to modify it.

■ It was suggested at oral argument that if Tuscan is found not liable for breach of contract, the district court will lose jurisdiction over the claim against the Union for breach of the duty of fair representation, because this suit was brought as a "hybrid" action under 29 U.S.C. § 185 and plaintiffs could challenge the Union's breach of duty alone only before the National Labor Relations Board. However, the Supreme Court has made clear that a breach of contract by the employer is not ·a jurisdictional prerequisite to a suit against a union for breach of its duty of fair representation. *Breininger v. Sheet Metal Workers Int'l Ass'n*, 493 U.S. 67, 80–84, 110 S.Ct. 424, 432–35, 107 L.Ed.2d 388 (1989). Plaintiffs here rely for jurisdiction on 28 U.S.C. §§ 1331 & 1337 in addition to 29 U.S.C. § 185. Furthermore, in *Breininger*, the Court noted

> [w]hile in *Vaca* an allegation that the union had breached its duty of fair representation was a necessary component of the § 301 claim against the employer, the converse is not true here: a suit against the union need not be accompanied by an allegation that an employer breached the contract, since whatever the employer's liability, the employee would still retain a legal claim against the union.

493 U.S. at 82–83, 110 S.Ct. at 433–34. In the present case, Whelan's bad-faith concealment of the oral agreement violated the duty of fair representation regardless of whether Tuscan is liable for breach of contract. Cf. *Kozera*, 909 F.2d at 54–55 (reversing judgment against the employer but remanding the case for trial as to the union).

4. Apportionment of liability

■ Tuscan argues that even if it did breach the Agreement, the district court erred in holding it jointly and severally liable with the Union for damages. The general rule "is to apportion liability between the

employer and the union according to the damage caused by the fault of each." Vaca, 386 U.S. at 197, 87 S.Ct. at 920. When an employer and a union participate in the other's breach, however, joint and several liability may be appropriate. Id. at 197 n. 18, 87 S.Ct. at 920 n. 18.

In the present case, Judge Mukasey made two possibly contradictory findings as to the interrelatedness of defendants-appellants' conduct. In his August 1991 opinion on apportionment of damages, he held Tuscan and Whelan jointly and severally liable because "the breaches by the parties were mutually dependent and agreed upon." In September 1992, however, in another brief, unpublished opinion on plaintiff's motion for attorneys fees and costs, he noted that "Tuscan did not participate in the [U]nion's breach of the duty of fair representation."

■ If the Agreement was not amended by an oral agreement between Whelan and Caiola, or if Tuscan was not reasonably entitled to rely on Whelan's apparent authority, then Tuscan committed a breach of contract. In the event that the district court again so holds, we leave to it in the first instance the resolution again of issues concerning the apportionment of liability between the Union and Tuscan. Cf. *Bowen v. United States Postal Serv.*, 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983); *Aguinaga*, 993 F.2d at 1474–79; *Baskin v. Hawley*, 807 F.2d 1120, 1132–33 (2d Cir.1986); *Jones v. Trans World Airlines*, 495 F.2d 790, 798–99 (2d Cir.1974).

We affirm the judgment of the district court insofar as it holds the Union liable to plaintiffs. With respect to Tuscan's liability, we vacate and remand for further proceedings consistent with this opinion.