Ernest LEWIS, et al., Plaintiffs,

v.

TUSCAN DAIRY FARMS, INC. and Willie Whelan, as President of Local 584, International Brotherhood of Teamsters, Defendants.

No. 87 Civ. 7607 (MBM).

United States District Court, S.D. New York.

Dec. 15, 1995.

Louie Nikolaidis, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., New York City, for Plaintiffs.

Richard M. Naness, Clifford P. Chaiet, Jeffrey N. Naness, Kaufman, Naness, Schneider, & Rosenzweig, P.C., Melville, NY, for Defendant Tuscan Farms, Inc.

John Driscoll, Driscoll & Delaney, New York City, for Defendant Willie Whelan.

OPINION AND ORDER

MUKASEY, District Judge.

In prior opinions reported at 752 F.Supp. 116 (S.D.N.Y.1990) and 829 F.Supp. 665

(S.D.N.Y.1993), this court found after trial that plaintiffs, former utility workers at the Ozone Park milk processing plant owned and then closed by Liberty Farms, Inc., had proved that defendant William Whelan breached his duty as president of the union that represented them by refusing to enforce a contract provision protecting their right to seek work at the plants to which milk production from the closed plant had been transferred. Those opinions held also that defendant Tuscan Dairy Farms, Inc. breached the collective bargaining agreement (the "Agreement") by failing to enforce the provision in question.[1] Although Tuscan's principal position at trial was that the subject provision, even as written, did not apply to the Ozone Park plant closing, *see* 725 F.Supp. at 122–23, it apparently presented "much more focused" arguments to the Court of Appeals that the subject provision had been amended by agreement between the union and Tuscan, and that whatever might have been Whelan's failure to represent the union members fairly, Tuscan was entitled to rely on his agreement to amend the provision so as not to apply to plaintiffs. *Lewis v. Tuscan Dairy Farms, Inc.,* 25 F.3d 1138, 1144–45 (2d Cir. 1994).

Accordingly, the case is now before the court on remand from the Court of Appeals to "address the issues raised by Tuscan's arguments that the Agreement was orally amended and that, in any event, it was entitled to rely on Whelan's apparent authority to modify it." 25 F.3d at 1145. Further, if it is determined "that the Agreement was not amended by an oral agreement ..., *or* if Tuscan was not reasonably entitled to rely on Whelan's apparent authority, ... [and as a result that] Tuscan committed a breach of contract," then liability must be apportioned between the parties. *Id.* at 1146 (emphasis added). Finally, in the course of resolving issues of liability and apportionment, it is necessary to clear up some confusion I caused by issuing what the Court of Appeals understandably saw as "two possibly contradictory findings as to the interrelatedness of [the union's and Tuscan's] conduct." *Id.*

Although the Court of Appeals left open the possibility of expanding the record in aid of resolving these issues, *id.* at 1145, the parties have been content to rely on the record as it stood when the case was remanded, and have submitted memoranda arguing the issues on that basis. No party has asked that further testimony or other evidence be received.

For the reasons set forth below, I find that the issue of whether the contract was amended is irrelevant because Tuscan was not reasonably entitled in this instance to rely on Whelan's apparent authority, and that liability between the parties will be joint and several as to both damages and attorney fees.

I.

As noted in the initial opinion finding liability, Liberty Farms was one of 11 affiliated companies owned or controlled by Jules Kotcher that were the subject of a series of purchase contracts signed on June 22, 1987. Those contracts gave Tuscan the exclusive right to the output of the Kotcher companies, referred to collectively herein as Liberty Farms, and obligated Tuscan to buy Liberty Farms within 18 months or when Tuscan terminated the output contract, whichever came first. In addition, Kotcher and other owners and principals of Liberty Farms signed non-competition agreements which Tuscan could enforce even if the output agreement was abrogated. One feature of these agreements not noted in that initial opinion was that Tuscan employed Liberty Farms executives Kotcher and Marc Stern at salaries of $300,000 and $200,000 per annum, respectively, beginning June 22, 1987. (PX 7, 8) Tuscan also agreed to indemnify Liberty Farms for all liability arising under the Employee Retirement Security Act of 1974, known as ERISA. Tuscan exercised the option to buy Liberty Farms on July 20, 1987. (PX 2–9, 33, 34, 35; see also, PX 35, 38, 40 reflecting payment of ERISA liability) 752 F.Supp. at 117.

---

**1.** General familiarity with those prior opinions is assumed for current purposes so as to avoid lengthy restatement of matters not in issue, although some facts will be restated in aid of the coherence of this opinion.

That acquisition occurred during a period of upheaval in the milk business in New York State following a court decision declaring unconstitutional New York laws that had restricted distribution of milk originating outside the state. *Farmland Dairies v. Commissioner of Agriculture and Markets,* 650 F.Supp. 939 (E.D.N.Y.1987). After that decision, the unions representing milk industry workers in New York agreed to and did renegotiate their contracts in order to help in-state milk processors try to meet the price competition from out-of-state employers with lower labor costs. (Tr. 357–62) Beginning in January 1987, soon after the *Farmland* opinion, Whelan, president of Teamsters Local 584, began meeting with Kotcher and with Tuscan president Louis Caiola to discuss Tuscan's possible acquisition of Kotcher's companies, a move Whelan welcomed because he believed Kotcher did not have the resources or the will to compete with Farmland, an out-of-state milk producer. (Tr. 374–88) 752 F.Supp. at 117–18.

Among the entities related to Liberty Farms was Queens Farms, Inc., which operated a milk processing plant in Ozone Park, in the borough of Queens. In February 1987, soon after Whelan commenced his discussions with Caiola and Kotcher, rumors of a possible sale began to circulate at the Ozone Park plant, and grew more persistent by the spring. Eventually, the rumors were discussed at general membership meetings of the local, but Whelan provided no definite information to the members as to whether a sale was imminent. (Tr. 81–84, 89–90) Of particular concern to the employees at Ozone Park was what rights they would have if Tuscan bought the plant, closed it, and then switched production to other Tuscan facilities. General Rule IV C of Schedule C of the master agreement between Local 584 and the milk producers, including Liberty Farms, provided in pertinent part as follows:

C. Consolidation and Mergers

In all consolidations of branches or plants, company craft group seniority shall prevail for the purpose of layoffs, vacations, bidding and in all other usual respects.

If the [e]mployer acquires all or any part of a milk business or all or any part of a route in any milk business and merges or consolidates the same with its own business, or handles the same in any other manner, ... the [e]mployer shall be required to assume responsibility for the employment the employees who elect to or who are transferred to the new [e]mployer as provided herein who shall enjoy craft seniority, on the basis of the period of employment in the business acquired for the purpose of layoffs, vacations, bidding and in all other usual respects.

(PX 1, p. 30)

Before the Tuscan–Liberty Farms agreements were signed, Whelan was advised by union attorney John Driscoll that if Rule IV C were held to apply to an eventual Tuscan–Liberty Farms transaction, Whelan had the right to modify or ignore that Rule if he believed that to do so would serve the interest of the general membership of the union. (Tr. 490–91) Whelan testified to a slightly different understanding of his right as union president. He said he thought he did not have the right to change a provision of the contract but he did have the right to ignore it. (Tr. 444) As found in the initial opinion following trial, Whelan and Caiola apparently worked out an ad hoc arrangement before the Tuscan–Liberty Farms deal was signed whereby the Ozone Park production would be switched to other Tuscan plants, the seniority list of the Ozone Park plant would not be merged with the seniority lists of those Tuscan plants, and the union would not seek such merger. (Tr. 449–50, 455) 752 F.Supp. at 119.

In March 1987 Tuscan and Liberty Farms signed a letter of intent. (PX 5) The agreements granting Tuscan the option to purchase Liberty Farms assets, and containing other undertakings, were dated June 22, 1987. (See PX 6, p. 1) It bears emphasis that the transaction was an assets purchase and not a transfer of corporate ownership. (*Id.*)

Further, plaintiffs have called to my attention the unrebutted testimony of plaintiff Ernest Lewis that on June 22, 1987 a union officer told the Ozone Park employees that

the routes had been sold to Tuscan, and he and others attended a meeting in Kotcher's office where Stern told the men not to leave the employ of Liberty Farms, that the plant would not close, and that Liberty Farms would stay in business. (Tr. 142–43, 146, 150) Although neither disclosed the fact at the time, Kotcher and Stern as of June 22 were themselves Tuscan executives whose contracts included the obligation to devote all their time to Tuscan's business. (PX 7, 8) In view of Whelan's testimony, and Tuscan's own position in this litigation, that the union's agreement not to enforce Rule IV C allegedly was a key ingredient in Tuscan's decision to proceed with the Liberty Farms transaction (Tr. 384–85; Tuscan Post–Remand Mem. 11), it is inconceivable that Kotcher and Stern were unaware of that agreement. Which is to say, on June 22 Kotcher and Stern, both newly minted Tuscan executives, helped to conceal from Ozone Park employees the arrangement between Whelan and Caiola that would deny those employees the rights guaranteed them under Rule IV C. It is plain that the longer those employees remained ignorant of what was to befall them, the less they could do about it, whether by way of petition to the union for a vote or petition to a court for legal redress.

Tuscan exercised its option in July to purchase the Liberty Farms assets, the Ozone Park plant was closed on July 20, the "vast bulk" of that plant's production was transferred to Tuscan's Lindenhurst and Woodside facilities (Tr. 520), and the Ozone Park employees were told by union officers to get jobs elsewhere. (Tr. 91) 752 F.Supp. at 120. When plaintiffs in this case importuned the union to seek arbitration, Whelan and others waltzed them languidly around the floor as described in my earlier opinions, concealing all the while Whelan's agreement with Caiola not to enforce Rule IV C. 752 F.Supp. at 120–21; 829 F.Supp. at 666–67. This deceitful dance is reflected also in a July 6, 1987 letter from plaintiffs' counsel Arthur Z.

Schwartz, Esq. to Whelan, with a copy to Tuscan, invoking Rule IV C and requesting that he enforce it, as well as in the suggestion by union counsel after the Ozone Park plant was closed that Tuscan might be willing to arbitrate the applicability of Rule IV C, a suggestion Tuscan categorically rejected. (PX 31, esp. letters from plaintiffs' counsel Arthur Z. Schwartz, Esq. dated August 6, 1987 and August 18, 1987, and letter from Tuscan counsel Richard M. Naness, Esq. dated August 13, 1987)

Thus, in addition to being misled by their union, plaintiffs were misled also by Tuscan beginning in June 1987. As noted above, Stern and Kotcher, both affirmatively and through silence, concealed in June and July 1987 Kotcher's arrangement with Whelan that the Ozone Park plant could be closed and Rule IV C would not be enforced. Further, in August 1987, when plaintiffs' counsel wrote to Tuscan seeking arbitration to redress the alleged violation of Rule IV C, counsel for Tuscan rejected the request without suggesting that Tuscan believed there had been a binding agreement between the company and the union that the Rule would not apply to Ozone Park employees.

## II.

■ Tuscan argues that it could not have breached the Agreement because Caiola had negotiated an amendment with Whelan, a duly authorized union agent, to waive or modify Rule IV C, and that amendment was binding even absent membership ratification. It argues also that it was entitled to rely on Whelan's apparent authority.[2] Tuscan cites numerous cases for the proposition that neither a writing nor ratification is required to give effect to oral modifications of labor agreements negotiated by union or management representatives who have authority to bind their principals. However, as set forth more fully below, Tuscan overlooks that

**2.** Tuscan appears to argue also that this court and the Court of Appeals have both found that the Agreement was in fact modified, and that such a finding short circuits any further inquiry as to liability. If that is Tuscan's argument, it is undone by the very terms of the remand: to consider whether the Agreement was amended to

prevent application of Rule IV C to Ozone Park and whether Tuscan was justified in relying on Whelan's apparent authority. 25 F.3d at 1145. Unless the agreement was so amended and Tuscan was so justified, Tuscan is liable and the court must proceed to consider allocation of damages, fees and costs. *Id.* at 1146.

those cases apply only when there is reasonable belief that the agreements in question are authorized. It overlooks also that other cases create a separate category altogether for secret agreements concealed from union members with the active connivance of employers.

Tuscan's substantial reliance on *Kozera v. Westchester–Fairfield Elec. Contractors*, 909 F.2d 48 (2d Cir.1990), *cert. denied*, 498 U.S. 1084, 111 S.Ct. 956, 112 L.Ed.2d 1044 (1991), is misplaced. In that case, although union officials were found to have breached their duty of fair representation by signing but not disclosing to the members an agreement imposed pursuant to an arbitration award, the Court of Appeals held the agreement binding because the employer "could reasonably believe that officers of the Local Union had authority pursuant to the arbitration award to bind the union membership." 909 F.2d at 54. There was no evidence in *Kozera*, as there is here, of notice to the employer that union officers were concealing the agreement from their members.

In this case, union members met with Kotcher and Stern on June 22, after Whelan and Caiola had decided Rule IV C would not apply, and were actively misled by Stern about what was in store for them and what they should do. It must have been obvious to Stern and Kotcher at that meeting that these employees were completely unaware of the arrangement reached between Whelan and Caiola. Similarly, a letter dated July 6, 1987 from plaintiffs' counsel to Whelan, invoking Rule IV C and asking Whelan to enforce it, was copied to Queens Farms, Inc., the Kotcher entity that held the Ozone Park plant, and to Tuscan. (PX 31) Again, it was obvious from this letter that plaintiffs were entirely unaware of any agreement to suspend Rule IV C, and Tuscan has pointed to no evidence that suggests any basis Tuscan had for believing that plaintiffs' ignorance was unique among union members. If Tuscan believed Whelan had authority to agree not to invoke Rule IV C, that authority cannot have come from the union members, who were plainly unaware of any such agreement. *Kozera* does not hold that an employer may claim to rely on the apparent authority of a union representative to negotiate a contract amendment when both the union and the employer are actively engaged in concealing that amendment from those who are disadvantaged by it.

*NLRB v. Local 815, Int'l Bhd. of Teamsters*, 290 F.2d 99 (2d Cir.1961) (Friendly, J.), cited in *Kozera*, held it permissible for an employer to deal in binding fashion with a shop steward on the subject of one employee's continued union membership and eligibility to work, notwithstanding that the shop steward's conduct itself was improperly discriminatory. There is no hint in that case that the employer was a party to, or even aware of, the discrimination. Similarly, *Metco Prods., Inc. v. NLRB*, 884 F.2d 156, 159 (4th Cir.1989), which permitted a union to rely on the apparent authority of an employer's attorney to negotiate a contract when the contract was plainly up for negotiation and he had participated in all bargaining sessions, and *Central States Southeast and Southwest Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098, 1112–14 (6th Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 147 (1987), which permitted an employer to rely on the apparent authority of a union president to conclude a side letter agreement in an industry where such agreements were commonplace, both cited in *Kozera*, do not bear on the facts presented here for the same reason: neither permitted a party to a deception later to claim reliance on apparent authority.

Inapposite as well are additional cases cited by Tuscan, including *Moreau v. Local 247, Int'l Bhd. of Firemen & Oilers*, 851 F.2d 516 (1st Cir.1988), *Chrysler Workers Ass'n. v. Chrysler Corp.*, 834 F.2d 573 (6th Cir.1987), *cert. denied*, 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988), and *NLRB v. Local 100, Int'l Bhd. of Teamsters*, 532 F.2d 569 (6th Cir.), *cert. denied*, 429 U.S. 859, 97 S.Ct. 160, 50 L.Ed.2d 137 (1976). In *Moreau*, the international union told an employer directly that a local union had authority to negotiate side agreements, there was no indication to the contrary at the time the side agreement in question was negotiated, and indeed the agreement in question was disclosed to union members and plaintiff himself was aware of

its provisions at the time he sought the transfer that the agreement barred. *Moreau,* 851 F.2d at 517, 518. In *Chrysler,* the Court noted the letter agreement in dispute had been explained to union members and "[t]here was no 'affirmative' act of concealment." 834 F.2d at 582. The same cannot be said here. In *Local 100* nothing put the company on notice that the union representatives it dealt with had not negotiated a binding agreement, and it was entitled to rely on their apparent authority. 532 F.2d at 571. Here, the conduct of Kotcher and Stern in June, and of Tuscan in July, reflect that Tuscan was relying on Whelan's apparent ability to conceal the arrangement with Caiola rather than on his apparent authority to conclude it.

The company argues that the Agreement does not require ratification of such a limited step as the waiver of Rule IV C in connection with the Ozone Park plant closing. Tuscan argues that ¶ 26 of the Agreement, which creates a procedure for collective bargaining to deal with problems during the term of the Agreement through the device of a meeting between the union and the multi-employer Greater New York Milk Dealers Labor Committee ("GNYMDLC"), was meant to deal only with issues that affect the industry as a whole, and does not mean that the union may not conclude a side agreement with a particular employer to resolve an issue unique to that employer. Tuscan argues also that ¶ 3B of the Addendum to the Agreement, which provides a procedure for reopening the Agreement if a non-signatory employer such as Farmland begins to compete on terms more favorable than those available to signatory employers, provides only the procedure for compulsory reopening of the Agreement, and does not bar voluntary arrangements such as the one negotiated between Caiola and Whelan. Further, Tuscan maintains that ¶ 14 of the Agreement[3] suggests the possibility of side agreements between the union and individual employer signatories.

That section provides that if the union enters into a contract with a non-signatory to the Agreement which gives that non-signatory better terms than those applicable to signatories, or if the union permits a signatory to operate in violation of the Agreement on terms more favorable than those applicable to other signatories, any employer comparatively disadvantaged may adopt those more favorable terms.

Tuscan insists there is no evidence it was on notice at the time of any requirement in the union by-laws or constitution that required ratification of amendments to collective bargaining agreements. By contrast, plaintiffs point to Tuscan's membership in the GNYMDLC in 1987, when a proposed contract modification was initially voted down and then accepted by the union (PX 50, DX H), and argue that this is evidence Tuscan must have known about the ratification requirement.

Tuscan's arguments here are wanting. Tuscan's claim that ¶ 26 applies only to multi-employer issues reads text into the Agreement that is not there, and assumes with no justification that an agreement to waive Rule IV C for one employer while leaving it in place for others raises no multi-employer issue. Tuscan's reading of ¶ 14 to permit side agreements of the sort at issue here is dubious. As to a signatory to the Agreement, that section deals only with how other employers might respond to the eventuality that the union might tolerate a "course of conduct" at odds with the Agreement, not with whether the signatory in question might be found to have breached the Agreement if challenged by its employees.

Further, Tuscan did have at least one experience with an amendment to the collective bargaining agreement, albeit one that affected all employees in the industry, and was at least on notice that this union followed the

---

**3.** That paragraph provides: Should the Union at any time hereafter enter into an agreement with any milk company operating within the Metropolitan Area served by the Employer party to this Agreement, with terms and conditions more advantageous to such milk company, or should the Union in the case of any milk company which

has signed this form of agreement countenance a course of conduct by such company enabling it to operate under more advantageous terms and conditions than is [*sic*] provided for in this Agreement, the Employer, party to this Agreement, shall be privileged to adopt such advantageous terms and conditions. (PX 1 p. 7)

practice of putting important contract amendments to the test of a vote.

Beyond issues presented by the terms of the Agreement and the requirements of the union's by-laws and constitution is the stark fact of Tuscan's own participation in Whelan's deception of his members. Here, it is necessary to address and undo the confusion I caused in this case with apparently contradictory findings in two unpublished opinions in August 1991 and September 1992, reported at No. 87 Civ. 7607, 1991 WL 156689 (S.D.N.Y. Aug. 8, 1991) and No. 87 Civ. 7607, 1992 WL 226927 (S.D.N.Y. Sept. 3, 1992), respectively. In the former, I found Tuscan and the union jointly and severally liable to plaintiffs for damages because "the breaches by the parties were mutually dependent and agreed upon." 1991 WL 156689 at *1. In the latter, when assessing fees and costs solely against the union, I stated that "Tuscan did not participate in the union's breach of the duty of fair representation." 1992 WL 226927 at *1. Although these opinions were written to treat issues of damage and attorney fee allocation, Tuscan has cited the quoted portion of the second, and a later opinion granting reargument but adhering to the second, No. 87 Civ. 7607, 1992 WL 346355 (S.D.N.Y. Nov. 18, 1992), as a fact finding that controls the liability issues on remand. That finding, Tuscan argues, is the law of this case.

■ The statement in the August 1991 opinion that the breaches were "mutually dependent and agreed upon" was correct but did not go far enough. The quoted segments from the September 1992 opinion on which Tuscan relies were part of a discussion concluding that in hybrid § 301 cases where an employee alleges that his employer breached the contract and his union breached its duty of fair representation, fees are recoverable against the union by statute, but against the employer only by contract absent proof that the employer participated in the union's breach of its fair representation duty. The statement that Tuscan did not participate in the union's breach of the duty of fair representation was meant to convey only a truism, and all that seemed at the time to be relevant: that because Tuscan itself did not owe such a duty, and was not directly involved in performing the duty, Tuscan could not itself have breached the duty. Plaintiffs did not argue then, as they have now, the implications of the parties' joint conduct and that there was evidence of Tuscan's own deception that complemented Whelan's. Regrettably, I did not focus *mea sponte* on that evidence. Better late than never. To the extent the law of the case doctrine exists in federal court, it sets a prudential and not a mandatory rule, *Higgins v. California Prune & Apricot Grower, Inc.*, 3 F.2d 896, 898 (2d Cir.1924) (L. Hand, J.) ("the 'law of the case' doctrine does not rigidly bind a court to its former decisions"), and does not prevent a court from correcting its own mistakes.

On the facts present here, it is apparent that beginning at least in June 1987 Tuscan participated in Whelan's duplicity, and thus could not have relied in good faith on Whelan's apparent authority to secure a waiver of Rule IV C. *Bennett v. Local Union No. 66, Glass Workers Int'l Union*, 958 F.2d 1429, 1435 (7th Cir.1992) (refusing to uphold secret contract modification that sacrificed rights of particular employees); *Merk v. Jewel Food Stores*, 945 F.2d 889, 893–96 (7th Cir.1991), *cert. denied*, 504 U.S. 914, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992) (same).

Whelan had no authority, apparent or otherwise, to mislead his members. Tuscan was aware beginning at least in June 1987 that he had done so, and at the very least fell in line with that strategy. When Tuscan refused to honor Rule IV C, it breached the contract.

### III.

■ The usual rule in hybrid Section 301 cases where the union has breached its fair representation duty and the employer has breached the collective bargaining agreement is that damages are apportioned, *Bowen v. United States Postal Serv.*, 459 U.S. 212, 230, 103 S.Ct. 588, 599, 74 L.Ed.2d 402 (1983); *Vaca v. Sipes*, 386 U.S. 171, 197, 87 S.Ct. 903, 920, 17 L.Ed.2d 842 (1967), such that the employer may be required to pay damages caused until the time an arbitrator would have cured the breach, and the union may be required to pay damages accruing thereafter. Alternatively, a court may allo-

cate responsibility for damages based on proportionate fault. *See Aguinaga v. United Food & Comm. Workers Int'l Union,* 993 F.2d 1463, 1474–76 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994). However, when the parties participate in one another's breaches the rationale for apportionment is not present. *Baskin v. Hawley,* 807 F.2d 1120, 1132–33 (2d Cir.1986), and cases cited therein. That is what happened here. Tuscan sought the union's agreement to breach the duty of fair representation by not enforcing the plaintiffs' seniority rights, and the union, through Whelan, gave that agreement so that Tuscan could breach its contractual obligation to honor those rights. "In such circumstances, it is no longer 'unjust' to hold either party accountable for the entire period of injury." *Bennett,* 958 F.2d at 1440–41.

The same reasoning applies to attorney fees. The September 1992 opinion herein, 1992 WL 226927 at *1–2, relied on *Ames v. Westinghouse Elec. Corp.,* 864 F.2d 289 (3d Cir.1988), a case in which there was no claim that the employer had participated in the union's breach of its duty of fair representation, *id.* at 293, as authority that justified allocating responsibility for plaintiffs' attorney fees only to the union, and justified also awarding only those fees incurred for pursuing plaintiffs' claims against Tuscan. It appeared at the time that in this case, as in *Ames,* there was no claim of employer participation in the union's breach of its duty of fair representation. However, it appears now that there is such a claim, and that it has merit for the reasons discussed above. Accordingly, this is a case for imposing joint and several responsibility for all attorney fees. *Bennett,* 958 F.2d at 1440.

For the reasons set forth above, Tuscan is found to have breached the collective bargaining agreement, and Tuscan and the union will be jointly and severally liable for plaintiffs' damages and attorney fees.

SO ORDERED.