Ernest LEWIS, et al., Plaintiffs,

v.

TUSCAN DAIRY FARMS, INC. and Willie Whelan, as President of Local 584, International Brotherhood of Teamster, Defendants.

No. 87 Civ. 7607 (MBM).

United States District Court,
S.D. New York.

Nov. 26, 1990.

Louie Nikolaidis, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, P.C., New York City, for Ernest Lewis, et al.

Martin Gringer, Robert Lipp, Kaufman, Frank, Naness, Schneider & Rosensweig, P.C., Melville, N.Y., for Tuscan Dairy Farms, Inc.

James J. Delaney, Driscoll & Delaney, New York City, for Willie Whelan.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs are former utility workers at the Ozone Park, New York plant of Liberty Farms, Inc., a milk processor and distributor. Utility workers work in the milk processing plant and deliver milk to schools or to customers who need supplemental deliveries or who order milk irregularly; they are distinguished from route workers, who deliver milk along regular routes. Plaintiffs claim that defendant William Whelan, sued here as Willie Whelan, president of the local union they belonged to, violated his and the union's duty to represent them fairly in connection with defendant Tuscan Dairy Farms, Inc.'s purchase of the assets of Liberty Farms. In particular, they claim that they were unfairly denied the contractual right to be hired at Tuscan's Lindenhurst and Woodside, New York plants with their seniority determined based on their tenure at Liberty Farms, a right they assert is guaranteed by the terms of the collective bargaining agreement. As a result, they seek recovery against both Whelan and Tuscan under § 301 of the National Labor Relations Act, 29 U.S.C. § 185.[1] Following denial of Tuscan's summary judgment motion in June 1989, the case was tried to the court as to liability only from July 30 to August 3, 1990, with post-trial submissions received thereafter.

After evaluating all the evidence, including but not limited to the credibility of the witnesses, I find for the reasons set forth below that plaintiffs have proved liability, and accordingly will recover such damages as may be either determined in a later proceeding or agreed to among the parties.

### I.

Liberty Farms was one of 11 affiliated companies owned or controlled by Jules Kotcher that were the subject of a series of purchase contracts signed on June 22, 1987. These contracts gave Tuscan the exclusive right to the output of the Kotcher companies, referred to herein collectively as Liberty Farms, and obligated Tuscan to buy Liberty Farms within 18 months or when Tuscan terminated the output contract, whichever came first. In addition, Kotcher and other owners and principals of Liberty Farms signed non-competition agreements which Tuscan could enforce even if the output agreement was abrogated. Tuscan also agreed to indemnify Liberty Farms for all liability arising under the Employee Retirement Income Security Act of 1974, known as ERISA. Tuscan exercised the option to buy Liberty Farms on July 20, 1987. (PX 2–9, 33, 34, 45; see also, PX 35, 38, 40 reflecting payment of ERISA liability)

That acquisition occurred during a period of upheaval in the milk business in New York State following a court decision declaring unconstitutional New York laws that had restricted distribution of milk originating outside the state. *Farmland Dairies v. Commissioner of New York State Department of Agriculture and Markets*, 650 F.Supp. 939 (E.D.N.Y.1987). After that decision, the unions representing milk industry workers in New York agreed to and did renegotiate their contracts in order to help in-state milk processors try to meet the price competition from out-of-state employers with lower labor costs. (Tr. 357–

---

1. The statute reads in pertinent part as follows: "(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties."

There is no question in this case that the milk industry is one affecting commerce, or that the court has jurisdiction of the parties. The cases giving rise to the duty of fair representation are discussed below.

62) Beginning in January 1987, soon after the *Farmland* opinion, Whelan, president of Teamsters Local 584, began meeting with Kotcher and with Tuscan president Louis Caiola to discuss Tuscan's possible acquisition of Kotcher's companies, a move Whelan welcomed because he believed Kotcher did not have the resources or the will to compete with Farmland. (Tr. 374–88)

Among the entities related to Liberty Farms was Queens Farms, Inc., which operated a milk processing plant in Ozone Park. In February 1987, soon after Whelan commenced his discussions with Caiola and Kotcher, rumors of a possible sale began to circulate at the Ozone Park plant, and grew more persistent by the spring. Eventually, the rumors were discussed at general membership meetings of the local, but Whelan provided no definite information to the members as to whether a sale was imminent. (Tr. 81–84, 89–90) Of particular concern to the employees at Ozone Park was what rights they would have if Tuscan bought the plant, closed it, and then switched production to other Tuscan facilities. General Rule IV C of Schedule C of the master agreement between Local 584 and the milk producers, including Liberty Farms, provided in pertinent part as follows:

C. Consolidations and Mergers

In all consolidations of branches or plants, company craft group seniority shall prevail for the purpose of layoffs, vacations, bidding and in all other usual respects.

If the [e]mployer acquires all or any part of a milk business or all or any part of a route in any milk business and merges or consolidates the same with its own business, or handles the same in any other manner, ... the [e]mployer shall be required to assume responsibility for the employment of the employees who elect to or who are transferred to the new [e]mployer as provided herein who shall enjoy craft group seniority, on the basis of the period of employment in the business acquired for the purpose of layoffs, vacations, bidding and in all other usual respects.
(PX 1, p. 30)

Whelan was up for reelection in 1987 and the potential shutdown of Ozone Park and the insistence of the workers at that plant that their seniority be honored presented him with a political problem, as he acknowledged at trial. (Tr. 415) Indeed, one Ozone Park employee testified that Whelan told him explicitly that because it was a political year, Whelan could not risk the wrath of the more than 200 men at Tuscan's Lindenhurst and Woodside plants, which would pick up most of the production capacity and distribution functions of the Ozone Park plant after the acquisition, simply to please the 100 or so utility workers at the Ozone Park plant, who were relatively senior and would displace workers at Lindenhurst and Woodside if allowed to take their Ozone Park seniority to those plants. (Tr. 335–36, 407–08) Another testified to a similar conversation on the day the Ozone Park plant closed. (Tr. 297–98)

How Whelan responded to the concerns of the Ozone Park employees, and what position he took publicly as to the applicability of the clause quoted above, was sharply disputed at trial.

Whelan conceded at trial that although General Rule IV C applied as a general matter to utility employees (Tr. 449), he made no attempt to determine how the Tuscan—Liberty Farms transaction was structured or to examine the documents underlying that transaction. (Tr. 451–52) Union counsel John Driscoll testified that in late May or early June Whelan told him that the men at Ozone Park were beginning to ask about their seniority rights and about the applicability of Section IV C, and that he then did what he considered to be sufficient legal research and reported to Whelan as follows:

"The result of all of this is I came to the conclusion what Willie had to do is to make a determination what is in the best interest of the general membership? Not what is in the best interest of Ozone Park. Not what is in the best interest of Willie Whelan. But what is in the best

interest of the general membership. Having done that, I advised him that it was my legal opinion that he had the power even if Article 4(c) was held to apply, that he had the power to modify that or to ignore that if he thought it necessary in order to promote the interest of the general membership."

(Tr. 490–91) That conversation as well occurred in "late May, early June of 1987" (Tr. 491)—*i.e.*, before the Tuscan—Liberty Farms agreements were signed. Whelan testified as follows to his view of the union's power to ignore contractual provisions:

"Q. You testified on direct examination that, 'You could ignore it, but not change it,' referring to the collective bargaining agreement. Is that correct?

A. Certainly." (Tr. 441)

"Q. Does the international constitution and the local bylaws permit the local union executive board to modify a contract?

A. To change it?

Q. Modify.

A. What do you mean?

Q. To change the language of the contract?

A. No, you can't change the language. We cannot change the contract.

Q. Without membership ratification?

A. That's right.

Q. Is the union allowed to ignore provisions of the contract?

A. Sure." (Tr. 444)

The collective bargaining agreement provides for the possibility that problems may arise during the term of the contract that must be resolved by collective bargaining, and grants to both the union and Greater New York Milk Dealers Labor Committee the right to seek a meeting to resolve such problems. "Any meeting so convened shall have plenary authority to resolve any such matter, notwithstanding any provision of the contract." (PX 1 p. 9 ¶ 26) But no meeting was called pursuant to that provision. Rather, Whelan and Caiola of Tuscan apparently worked out an ad hoc arrangement which Whelan felt empowered to implement. He was not so empowered. The union by-laws provide that amendments to collective bargaining agreements must be ratified by vote of the membership. (PX 19 p. 14 § 27) The union constitution is to the same effect. (PX 20 Art. XII Sec. 2(b) p. 75) As set forth below, to the extent Whelan suggested in his testimony that he had in fact secured the approval of the union membership, that testimony cannot be credited.

At the time Whelan made his decision not to seek merger of the seniority lists pursuant to General Rule IV C, he was unaware of how the Tuscan—Liberty Farms deal would be structured (Tr. 451–52) and had already told Caiola of Tuscan that he would not insist on a merger of seniority lists (Tr. 455), although he conceded that whether or not seniority lists had to merge depended on what Caiola's company bought. (Tr. 449) Nor did Whelan discuss the issue any further with his counsel after the documents were signed and the plant closed in July because, as Driscoll testified, "His decision had already been made.". (Tr. 495)

. Seven Ozone Park employees testified that Whelan told those present at a membership meeting in June that if Tuscan bought the equipment at the Ozone Park plant, or paid the unfunded ERISA liability relating to that plant, he would consider that a merger and would demand that the seniority of Ozone Park employees be merged with the seniority of the employees at the plants to which the production was shifted. (Tr. 81–88, 198–99, 239, 255–56, 295–96, 321, 335) Lewis and others testified that in June Whelan was taking the position that they should not jump ship despite Kotcher's sale of certain of the routes processed by Ozone Park, and indeed that employees who left Ozone Park would not receive union work cards allowing them to secure employment elsewhere. (Tr. 148–50, 321–22; *cf.*, Tr. 250)

Whelan insisted not only that he did not take that position, but that he said the opposite, and told the most senior men to leave first. (Tr. 397) He testified that he spent three hours at a general membership meeting June explaining why the seniority lists could not be merged, and telling em-

ployees at the Ozone Park facility to get out and find jobs because that facility was going to close. (Tr. 401–05) Although one plaintiff testified to a private conversation with Whelan consistent with the union president's recollection of what he was saying publicly (Tr. 290–91), I do not credit Whelan's description at trial of what he was telling union members. As Whelan himself ruefully acknowledged, plaintiff Ernest "Buddy" Lewis, the shop steward at Ozone Park, was a frequent antagonist of Whelan and aggressive in protecting the interests of his constituents. (Tr. 368–70, 474–75) Lewis's testimony and demeanor at trial bore that out. It is inconceivable that Lewis could have heard Whelan take that position and not demand arbitration of the issue, as he did after the Ozone Park plant closed in July and it became evident, for the first time in my view, that union officers would not act to protect the seniority of the Ozone Park employees. Moreover, Whelan showed himself at trial to be a master of circumlocution. (e.g., Tr. 384, 398, 402–03, 422–24, 425–26, 434–35, 449–50, 463–65) Based on the inaction of the Ozone Park employees at the time and Whelan's own interest at the time in generating as little unrest as possible, it seems far more likely that he talked artfully around the issue. Another motive Whelan had not to press the cause of the Ozone Park employees was his interest in obtaining a $2.5 million payment into the pension fund to cover the unfunded ERISA liability of the Kotcher companies for the Ozone Park employees, a liability assumed by Tuscan. That payment would not have been forthcoming as quickly as it was if Tuscan had been required to hire the Ozone Park employees at Lindenhurst and Woodside. (Tr. 454–56, 458–59)

Tuscan exercised its option in July, the Ozone Park plant was closed on July 20, and the employees were told by union officers to get jobs elsewhere. (Tr. 91) Upon the closing of the Ozone Park plant, the "vast bulk" of that plant's production was transferred to Tuscan's Lindenhurst and Woodside facilities. (Tr. 520) About 75% in dollar value of the Ozone Park milk processing equipment was transferred to Lin-

denhurst and Woodside. (Tr. 268) Further, all of the routes that had been serviced from Ozone Park were serviced from Lindenhurst and Woodside, except for the few routes owned by one independent distributor, Beyer Farms, (cite—pbr. 7) and a few "sparse" routes that were transferred to Elmhurst Dairy, an entity not affiliated with Tuscan. (Tr. 300, 317–20) In the months after the merger, 71 additional utility workers were hired at the two plants to which the Ozone Park production had been shifted—34 at Lindenhurst and 37 at Woodside. (PX 48A and 48B); Whelan conceded the additional hiring. (Tr. 422) Moreover, there was substantial overtime by utility workers at Lindenhurst and Woodside after the Ozone Park plant closed, such that as many as 40 additional workers might have been hired at Woodside and an indeterminate number at Lindenhurst (Tr. 243–45, 289, 302–03), although Whelan was evasive on the subject (Tr. 422–24) and insisted that Lindenhurst and Woodside did not successfully handle the added production and could not have done so even by hiring additional workers. (Tr. 416–19) The obvious thrust of this testimony, notwithstanding Whelan's contrary claim, was that if the union had pressed for a merger of seniority lists, most or perhaps all of the approximately 110 Ozone Park utility workers could have gotten jobs at either Lindenhurst or Woodside, as some eventually did albeit at the bottom of the seniority list. (See, e.g., Tr. 199, 240–41)

On July 24, 1987, four days after the plant was closed, plaintiff Lewis sent Whelan a written demand that General Rule IV C be enforced and the seniority list at Ozone Park merged with the lists at Lindenhurst and Woodside. (PX 15) Whelan understood that letter to be a demand that the seniority issue be submitted to arbitration if necessary (Tr. 409), as the contract provided. (PX 1, p. 7 ¶ 16(a)) Although the procedure for determining how the union would decide whether to press for arbitration is difficult to discern clearly in the union by-laws and constitution (PX 19 § 14; PX 20 Art. XII), Whelan testified without apparent contradiction that such matters

came initially before the executive committee and then before the general membership, which would approve or disapprove the decisions of the executive committee based on a reading of the executive committee minutes, as follows:

> "[I]f the minutes—for example, the executive board voted to buy John Kelly a car, they brought it back to the membership, we would not accept the minutes as read, we overruled it and John Kelly didn't get a car.
>
> "The membership rejects decisions by the executive board at the general membership meeting and that's the procedure and that's where the power lies, in that general membership meeting."

(Tr. 412) Lewis testified also that the decision as to whether to arbitrate grievances would be made initially by vote of the executive committee. (Tr. 55–57) Whelan testified that the usual procedure was followed in this case, with the issue of whether or not to arbitrate the Ozone Park seniority dispute having been taken up at an August 6, 1987 meeting of the executive committee, the minutes of which were later read to and approved by a general membership meeting. (Tr. 409–13; PX 14) Other executive committee members did not bear out Whelan's recollection. (PX 47 E at 67–68, 47 F at 13, 47 G at 10, 47 H at 20, 47 I at 32–33)

Lewis categorically denied ever hearing or seeing evidence that his demand had ever been voted on at an executive committee meeting. (Tr. 95–97) The only objective corroboration Whelan relies on to support his claim that the issue was discussed at the August 6 executive committee meeting is the following entry in the minutes: "A lengthy discussion followed on the acquisition of Queens Farms by Tuscan Dairy." (PX 14, p. 3) Whelan testified, after several vain attempts to avoid the court's questions, that that language was read to and approved by the membership, thereby ratifying the decision not to take the dispute to arbitration. (Tr. 468–71) Whelan's testimony in this respect is unworthy of belief. The minute entry in question could not have placed anyone on notice that the executive committee had decided not to arbitrate the issue of Ozone Park seniority. Moreover, the language cited by Whelan is far different from language in other executive committee minutes dealing with the subject of grievances, which states explicitly the outcome of a vote. (PX 14, p. 1)

## II.

Whelan offered several arguments at trial as to why he would not have promised to seek merger of the Ozone Park seniority list after the Tuscan acquisition. Thus, he suggested that utility employees at one plant could not easily work at another (Tr. 429–30), a position contradicted not only by contrary testimony from his adversaries at trial (Tr. 301), but also by the fact that some plaintiffs did secure employment at other plants (Tr. 241–42, 288, 301, 333, 336) and by Whelan's own concession on cross-examination that utility work at one plant was very much like utility work at another. (Tr. 428–34)

Further, he suggested that it would be difficult to determine how much of the Ozone Park work had gone to various other plants, and dovetailing the seniority lists would be an intractable task. (Tr. 399–400, 404–05) But that is not to say that no reasonable accommodation could have been made by an arbitrator.

Finally, both Whelan and Tuscan made much at trial of the precarious condition of the milk industry in New York at the time of these events, suggesting that an attempt to merge seniority lists somehow would have weakened the industry still further or endangered Tuscan. But as set forth above, additional workers were hired at both Lindenhurst and Woodside, and workers at both plants did substantial overtime. There is every reason to believe that Ozone Park workers could have been dovetailed into the seniority lists at both plants over time with little adverse effect on the existing work force. That is not to say that the Lindenhurst and Woodside workers would have welcomed the idea from the outset. But there was no showing at trial that even this assumed objection from the Linden-

hurst and Woodside employees would have made it difficult or impossible to implement what the contract required, or that whatever difficulty arose would have had a notably adverse impact on the industry as a whole or Tuscan in particular.

### III.

■ Plaintiffs' claim against Whelan and Tuscan imposes upon them a double burden. They must show both that the treatment of their seniority claim was contrary to the contract and that the union breached its duty of fair representation. Absent such a showing, they cannot recover against either defendant. *Hines v. Anchor Motor Freight*, 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059–60, 47 L.Ed.2d 231 (1976).

### A.

■ The contract claim is relatively straightforward. As quoted above, General Rule IV C of the master agreement requires that whenever an employer "acquires all or any part of a milk business or all or any part of a route in any milk business and merges or consolidates the same with its own business," that employer must honor the seniority claims of "the employees who elect to or who are transferred to the new [e]mployer...." The union and Tuscan declined to enforce that provision. Defendants advance two arguments to justify their conduct, neither sufficient.

Tuscan suggests in its post-hearing brief that when it closed the Ozone Park plant it did not, properly speaking "merge" or "consolidate" that plant with its Lindenhurst and Woodside operations, but rather simply closed the Ozone Park plant because it was inadequate, and then sold the assets; Tuscan then cites two instances of alleged past practice in which such plant closing did not result in merger of seniority lists. (Tuscan Post–Trial Mem. 4) In aid of that argument, Tuscan has submitted several New York City Department of Health notices of violation relating to the Ozone Park plant. (DX D) That evidence is beside the mark for several reasons. First, it is contradicted and entirely rebutted by the sim-

ple fact that Ozone Park remained in operation at all times relevant to this lawsuit, and that none of the citations submitted by Tuscan purports to direct that the plant be closed. Moreover, the most serious of the violations occurred in July 1987, after Tuscan and Kotcher had signed their agreements, at a time when Kotcher plainly had no incentive to maintain the facility properly. Certainly, this evidence does not show that the Ozone Park facility was simply shut down for some reason apart from the Liberty Farms—Tuscan merger. Moreover, this argument takes no account of the substantial showing that the Ozone Park production was taken over by Tuscan's Lindenhurst and Woodside plants. The only gap in that evidence is comprised of missing production records that Tuscan did not supply. However, employment records and testimony have provided ample proof. Indeed, defendants did not contest at trial that virtually all of the Ozone Park production was taken up by Lindenhurst and Woodside.

Further, Tuscan's reliance on the two past instances it cites is misplaced. In one instance, it appears from the testimony Tuscan cites that the employer in question went bankrupt and the plant was simply closed down. (Tr. 157–58) That was not the case here. The other instance is the Delltown Foods, Inc. case of which both defendants have made more than its similarity to the case at bar would justify. In that instance, Delltown acquired Sealtest's Richmond Hill plant, where the employees were represented by Local 584, and switched the bulk of the production that had taken place at the Richmond Hill plant to Delltown's Yonkers plant, which was within the jurisdiction of another local union—Local 338—under a separate contract. Delltown also had a plant at Copiague, Long Island whose employees were represented by Local 584. Less than 20% of the production from Richmond Hill was switched to the Copiague plant. The arbitrator accepted the uncontroverted testimony of the chairman of the Industry Negotiating Committee at the time Article IV C was negotiated, to the effect that these facts presented a situation "not contem-

plated by the parties as the type of situation intended to be governed by the first paragraph of Section C." (DX A, p. 5) The content of that testimony has not otherwise been disclosed. Whatever was the content of that testimony, it is apparent that where as here the overwhelming bulk of both the equipment and the production was transferred to Tuscan's Lindenhurst and Woodside plants, both of whose employees are represented by Local 584, we are dealing with facts that are so far different in degree from those presented in Delltown as to be different in kind. If the merger clause at issue cannot be read to cover the case at bar, then it cannot be read to cover any case in which less than 100% of one plant's operations is merged into the operations of another. That, in turn, would nullify the broad language of the clause itself: "... all or any part of a milk business...."

Finally, it bears mention again that on Whelan's and his counsel's testimony, he made his decision not to apply General Rule IV C without regard to whether or not the arbitral decision in Delltown was controlling, but rather in the belief that not applying that provision was in the best interest of the union at large.

I find that General Rule IV C does cover the Tuscan—Liberty Farms merger, and that it was a breach of contract for the parties not to honor the seniority of Ozone Park employees.

### B.

■ Why the above facts constitute not only a breach of contract but also a violation of the union's duty of fair representation should be apparent from examining the reasons underlying that duty, and its scope. At the outset, it must be recalled that we are dealing here with a claim that the duty of fair representation has been breached in administering a collective bargaining agreement, not in negotiating one. As set forth below, that distinction is crucial because the flexibility and discretion that may be permitted to a union when it is negotiating a contract is not available in equal measure when the union is adminis-

tering a contract. *Thomas v. United Parcel Service, Inc.*, 890 F.2d 909, 918–19 (7th Cir.1989); *See generally,* C.W. Summers, "The Individual Employee's Rights Under the Collective Bargaining Agreement: What Constitutes Fair Representation?" in J.T. McKelvey, ed., *The Duty of Fair Representation,* New York State School of Industrial & Labor Relations—Cornell University (1977).

The duty of fair representation originated in two Supreme Court cases dealing with contract negotiation: *Steele v. Louisville & Nashville Railroad,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) and *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen,* 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944). Those cases involved claims that labor unions had compromised the rights of those they were supposed to represent by negotiating contracts that placed black employees at the bottom of the seniority list. The duty there articulated arose from the union's status as the collective bargaining agent for all members of the bargaining unit. The organization "chosen to represent a craft must represent all its members, the majority as well as the minority, and it is to act for and not against those whom it represents." *Steele,* 323 U.S. at 202, 65 S.Ct. at 232. However, the Supreme Court recognized that a collective bargaining agent may be called upon to compromise some rights in the interest of securing others, and thereby necessarily to make choices that affect some employees favorably, and others unfavorably. The Court recognized the need for such discretion to make choices based on relevant criteria such as seniority, nature of work, and the like, and permitted it so long as the discretion was exercised in good faith. Thus, in *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), the Court upheld the discretion of the union to negotiate a seniority clause that gave returning veterans credit for the time they had spent in the armed forces, notwithstanding that such a clause created different standards for two classes of workers and operated to the detriment of those in the bargaining unit who had not served:

"The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Id.* at 338, 73 S.Ct. at 686.

Even by that lenient standard—discretion across a "wide range of reasonableness" governed only by "good faith and honesty of purpose"—the union's actions in this case could be found wanting. Even at the negotiation stage of a contract, it is not permissible, for example, to use political strength as the standard for determining whose rights will be protected. *Ferro v. Railway Express Agency, Inc.,* 296 F.2d 847, 851 (2d Cir.1961).

■ But the applicable standard is more demanding. A union may not "wrongfully" refuse to process a grievance, "wrongfulness" defined as conduct that is "arbitrary, discriminatory or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 185, 190, 87 S.Ct. 903, 914, 916, 17 L.Ed.2d 842 (1967). In a case remarkably similar to the one at hand, a union refused to honor seniority provisions in a contract governing company mergers, and to process grievances based on those provisions, because to do so would have produced unsettling results by displacing a large number of workers at one of the merged entities. A jury found such refusal to violate the duty of fair representation. *Butler v. Teamsters Local 823,* 514 F.2d 442, 453–54 (8th Cir.), *cert. denied,* 423 U.S. 924, 96 S.Ct. 265, 46 L.Ed.2d 249 (1975).

■ Here as well Whelan's conduct, although perhaps also discriminatory and in bad faith within the meaning of *Sipes* insofar as it may have been motivated by a desire to serve the interest of the Lindenhurst and Woodside employees at the expense of the Ozone Park employees, was assuredly arbitrary in the same sense as was the union's conduct in *Butler*—i.e., not following fixed rules or standards. Again, by his own testimony, he acted in the belief that he was free simply to ignore the contract (Tr. 441, 444, 450–51), a view he received from his attorney who believed Whelan had the power to act to serve what he saw as the greater good, regardless of what the contract provided. (Tr. 490–91) That is not consistent with the duty of fair representation. Thus, § 104 of the Landrum–Griffin Act makes it the "duty of the secretary or corresponding principal officer of each labor organization, in the case of a local labor organization, to forward a copy of each collective bargaining agreement made by such labor organization with any employer to any employee whose rights are directly affected by such agreement. . . ." 29 U.S.C. § 414. The obvious purpose of that section is to assure that employees know their rights. That purpose would be utterly undone if union officers were then free to abrogate those rights whenever they thought it appropriate. *Price v. International Brotherhood of Teamsters,* 457 F.2d 605, 610 (3rd Cir.1972).

■ That is not to say that the union could not have renegotiated the contract, as it did to deal with the crisis created by the *Farmland* decision, to provide for endtailing rather than dovetailing of seniority, even though to do so would have disserved the Ozone Park employees. That it could have done, so long as it complied with all rules applicable to ratifying such an amendment. *Papcin v. Dichello Distributors, Inc.,* 697 F.Supp. 73, 81 (D.Conn.), *aff'd,* 862 F.2d 304 (2d Cir.1988); *Jones v. Trans World Airlines, Inc.,* 495 F.2d 790, 798 (2d Cir.1974). It was not free, however, simply to disregard the contract. It follows also that Tuscan cannot rely on the union's reading of the contract, although how the damages may be apportioned between Tuscan and the union is a matter that must await a later proceeding. *Bowen v. United States Postal Service,* 459 U.S. 212, 218–20, 103 S.Ct. 588, 592–93, 74 L.Ed.2d 402 (1983); *Sipes,* 386 U.S. at 197–98, 87 S.Ct. at 920–21.

For the above reasons, which shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), both defendants are liable to plaintiffs as a re-

sult of the breach of contract and the union's violation of its duty of fair representation as described above. The court will schedule a conference to determine the procedure for assessing and allocating damages.

SO ORDERED.