LOCAL UNION 2426, UNITED MINE WORKERS OF AMERICA; Danny Deskins, on his behalf and on behalf of all members of Local Union 2426, Plaintiffs,

v.

DISTRICT 29, UNITED MINE WORKERS OF AMERICA; Local Union 1713; United Mine Workers of America; Joe Sparks, President of District 29, United Mine Workers of America, individually and on behalf of District 29, District Executive Board; and U.S. Steel Mining Company, Inc., Defendants.

Civ. A. No. 5:94–0294.

United States District Court,
S.D. West Virginia
at Beckley.

Sept. 15, 1994.

David L. Stuart, Charleston, WV, for plaintiffs.

Warren R. McGraw, II, Beckley, WV, for District 29, United Mine Workers of America, Local Union 1713, United Mine Workers of America, defendant, Joe Sparks.

Joseph M. Price, Mark A. Toor, Robinson & McElwee, Charleston, WV, for U.S. Steel Mining Co., Inc., defendant.

### ORDER

HALLANAN, District Judge.

On the 7th day of September, 1994, came the parties by counsel upon the application of Plaintiffs for a preliminary injunction and upon the application of Defendant U.S. Steel Mining Company, Incorporated, ("U.S. Steel"), for injunctive relief. The Plaintiffs consist of members of Local Union No. 2426 of the United Mine Workers of America ("L.U. 2426") and Danny Deskins, on his own behalf as a member of L.U. 2426 and on behalf of all members of L.U. 2426. Plaintiffs initiated this action seeking an order to arbitrate the grievance of L.U. 2426 and a preliminary injunction against Defendant U.S. Steel preventing it from "dovetailing"

the seniority units of L.U. 2426 and L.U. 1713.

## I.

Due to the unique nature of this action, a review of the facts is necessary. In January of 1994, U.S. Steel announced its intention to join its No. 50 and No. 51 mines by "cutting through" and making the separate and distinct mines into one. U.S. Steel also announced its intention to merge the separate seniority units of the two mines by a method known as "dovetailing." At the time of the hearing on September 7, U.S. Steel reported that it had recently completed the task of physically joining the two mines earlier that day.

Mine operations at the No. 50 mine, located in Pineville, Wyoming County, West Virginia, began in 1969. The mine operations at the No. 51 mine and preparation plant, which was in the same coal seam as the No. 50 mine but was some distance away, began in 1979. Members of L.U. 2426 worked at the No. 51 mine and members of L.U. 1713 worked at the No. 50 mine and preparation plant. Because the No. 50 mine had been in operation ten years longer than the No. 51 mine, the merging of the seniority units proposed by U.S. Steel provided that every L.U. 1713 employee hired between 1969 and 1979 would be at the top of the seniority list. Starting in 1979, the employees of L.U. 1713 and L.U. 2426 would be "dovetailed," meaning the list would begin alternating employ-

ees of the two mines: most senior from L.U. 1713, most senior from L.U. 2426, next to most senior from L.U. 1713, next to most senior from L.U. 2426, etc. This method resulted in placing the most senior member from L.U. 2426 at number 371 on the merged seniority list.

As a result of this proposal from U.S. Steel, L.U. 2426 filed a grievance on January 12, 1994.[1] The members of L.U. 2426 asserted in its grievance that U.S. Steel had not complied with the contract and had not respected the employees' relative positions in the work force. On the same date, L.U. 1713 filed a grievance because it believed that the members of L.U. 1713 should be placed at the top of the merged seniority unit, with all members of L.U. 2426 being placed at the bottom. Such a system is known as "stacking."

Both grievances proceeded through step two of the grievance procedure.[2] Once the grievances progressed to step three of the procedure, they were referred to a Sub–District Executive Board Member ("field representative"). The duly elected field representative was Michael Durham. Mr. Durham was elected by popular vote by the members in the appropriate sub-district. L.U. 1713 has approximately 800 eligible voting members and L.U. 2426 has approximately 270 eligible voting members in the sub-district.

1. U.S. Steel has been for many years a signatory to the National Bituminous Coal Wage Agreement (NBCWA) until recently when it joined the IBCBA, and Independent Coal Operators group. Nevertheless, it has been stipulated that the provisions of the new collective bargaining agreement concerning the issues of grievances and arbitration, applicable to this case, are identical to the same provision contained in the 1988 NBCWA.

2. The grievance procedure, as explained in Art. XXIII Section (c) of the collective bargaining agreement, contains four steps. They are as follows:

(1) The employee makes a complaint to his foreman who shall have the authority to settle the matter. The foreman has 24 hours within which to inform the employee of a settlement.

(2) If no agreement is reached between the employee and foreman, the complaint is submitted on a standard grievance form and shall be taken up by the Mine Committee and mine management within five working days of the foreman's decision. If the complaint is not settled within five working days, the grievance shall be referred to a representative of the UMWA district, designated by the Union, and a representative of the Employer.
(3) Within seven working days of the time the grievance is referred to them, the district representative and the employer's representative shall meet and review the facts and pertinent contract provision in an effort to reach agreement.
(4) If the district representative and employer representative fail to reach agreement, the matter shall, within ten calendar days of referral to them, be referred to the appropriate district arbitrator.

The step three meetings between Mr. Durham and the U.S. Steel representative on both grievances took place separately on January 25, 1994. The grievance of L.U. 2426 was referred to step four which is the arbitration step of the grievance procedure. It was then referred to an arbitrator, an arbitrator was selected and arbitration was set for March 3, 1994. The L.U. 1713 grievance was not referred to arbitration. Instead, Mr. Durham continued to discuss the L.U. 1713 grievance and attempt to arrive at some sort of settlement. As Mr. Durham testified in the September 7 hearing, he was faced with two different demands, that from L.U. 1713 and that from L.U. 2426. He also testified that he felt this presented a "conflict of interest." Nevertheless, Mr. Durham testified that he spoke with individuals from the International Union, the District Union representatives and former representatives for the purpose of gaining advice as to how to handle the situation with which he was faced and also how to interpret an applicable arbitration decision (ARB Decision No. 78–31). On February 16, 1994, the L.U. 1713 grievance was settled. The settlement was reached by Mr. Durham, the elected field representative, and U.S. Steel. That settlement also contained reference to the L.U. 2426 grievance, and on February 25, 1994, the L.U. 2426 grievance was withdrawn. Thus, the L.U. 2426 grievance was never presented to an arbitrator. Instead, the settlement of the two grievances provided that the merger of the two mines would result in a seniority unit with every L.U. 1713 employee hired between 1969 and 1979 at the top of the seniority list and, starting in 1979, the employees of L.U. 1713 and L.U. 2426 would be "dovetailed," meaning the list would begin alternating employees of the two mines: most senior from L.U. 1713, then the most senior from L.U. 2426, then next to most senior from L.U. 1713, then next to most senior from L.U. 2426, etc.. In essence, the original proposal of U.S. Steel was the result of the settlement.

As a result of the L.U. 2426 grievance not proceeding to the arbitrator and the settlement concerning the two grievances, Plaintiffs filed this action on April 13, 1994. The defendants in this action are U.S. Steel, District 29 of the UMWA, Joe Sparks, president of District 29 and elected member of the District 29 Executive Board, and Local Union No. 1713 of the UMWA. In the complaint, Plaintiffs allege the following: (1) the method proposed by Defendant U.S. Steel and chosen by Mr. Durham of dovetailing the two seniority units is contrary to the applicable collective bargaining agreement and arbitration decisions made and rendered in accordance with applicable collective bargaining agreements; (2) the settlement of the two grievances is contrary to the interests of plaintiffs, members of L.U. 2426, and is contrary to the applicable collective bargaining agreement and the arbitration decisions and awards made thereunder; (3) Mr. Durham's settlement of the aforesaid grievances demonstrated a clear conflict of interest and thus the union defendants have engaged in a violation of their duty of fair representation to the plaintiffs, members of L.U. 2426; and (4) the actions of U.S. Steel in merging the two seniority units in such a manner are a breach of the applicable collective bargaining agreement. Thus, Plaintiffs seek an order from this Court referring the matters in issue to arbitration and a temporary injunction prohibiting U.S. Steel from merging the two seniority units in the manner agreed upon in the settlement of the two grievances.

U.S. Steel filed an answer and counterclaim against Plaintiffs alleging the settlement of the said grievances constitutes a final and binding resolution of both grievances under the provisions of the collective bargaining agreement. Therefore, the institution and prosecution of this civil action by Plaintiffs constitute a violation of the provisions of the applicable collective bargaining agreement. Thus, U.S. Steel seeks injunctive relief enforcing the terms under which the grievances filed by L.U. 2426 and L.U. 1713 were resolved.

As earlier mentioned, the parties came before the Court on September 7, 1994, for the purpose of a hearing on Plaintiffs' complaint for injunctive relief and declaratory judgment and Defendant U.S. Steel's answer and counterclaim. The Court, after hearing testimony and receiving evidence, took the matter under advisement. All Parties were directed

to file any additional information by 12:00 p.m. on Friday, September 9, 1994, with any replies to be filed no later than 12:00 p.m. on Monday, September 12, 1994.

Upon request by the Court, **all Parties** agreed that no layoffs would occur until September 16, 1994. The Court then announced that its decision in this matter would be rendered by September 16, 1994.

## II.

It is widely agreed upon that "in this circuit the trial court standard for interlocutory injunctive relief is the balance-of-hardship test." *Blackwelder Furniture Co., ETC. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189 (4th Cir.1977); *see also Direx Israel, LTD. v. Breakthrough Medical Corp.,* 952 F.2d 802, 811 (4th Cir.1991), *as amended,* (4th Cir. 1992); *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991). Therefore, this Court must conduct a "hardship balancing test" to determine whether a preliminary injunction should be issued. *Blackwelder,* 550 F.2d at 195; *Direx Israel, LTD.,* 952 F.2d at 811. When conducting a "hardship balancing test," four factors must be considered: "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." *L.J. By and Through Darr v. Massinga,* 838 F.2d 118, 120 (4th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989). "The irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991).

If it should be found that the plaintiff had made a "clear showing" of irreparable injury absent preliminary injunctive relief, the *next* step then for the court to take is "to balance the 'likelihood' of irreparable harm to the plaintiff [from failure to grant interim relief] against the 'likelihood' of harm to the defendant [from the grant of such relief]...." *Blackwelder,* 550 F.2d at 195. "If, after balancing those two factors [i.e., irreparable harm to plaintiff against

harm to the defendant], the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required." *Rum Creek,* 926 F.2d at 359 (citations omitted). *Direx Israel, LTD,* 952 F.2d at 812–13. Thus, it is clear that "the balance of harm evaluation should precede the determination of the degree by which the plaintiff must establish the likelihood of success on his part." *Direx Israel, LTD.,* 952 F.2d at 813. This is so because any showing of probability of success on the merits will vary with the "quality and quantum of harm that [the moving party] will suffer from denial of an injunction." *Id.* (citations omitted).

With the standard clearly stated, this Court must first determine whether Plaintiffs, members of L.U. 2426, have made a clear showing that they will suffer an immediate irreparable harm if an injunction is not granted.

In support of their request for injunctive relief, Plaintiffs state that unless an injunction is granted, L.U. 2426 and its membership will cease to exist. (Plaintiffs' Memo in Support of Injunctive Relief and Order of Arbitration, p. 19). This will result from the layoffs scheduled to begin on September 16, 1994. Also, if U.S. Steel meets its projected work force reduction by the end of 1994, approximately 19% of the work force of L.U. 2426 will remain. Thus, Plaintiffs assert that a substantial number of them will permanently lose employment on September 16, 1994, if the status quo is not preserved. All of this, Plaintiffs assert, is due to the unlawful method of merging the two seniority units and U.S. Steel's plan to terminate a substantial number of employees. Plaintiffs then argue that the union defendants will suffer no harm and U.S. Steel "may suffer slightly greater harm than the union defendants (but not anything close to the harm to be suffered by plaintiffs in the absence of injunctive relief)." (Plaintiffs' Memo in Support of In-

junctive Relief and Order of Arbitration, p. 19).

Defendant U.S. Steel argues that Plaintiffs are simply incorrect on the issue of harms suffered. Instead, Defendant U.S. Steel asserts that if Plaintiffs are successful in gaining their injunctive relief, the practical effect will be that members of L.U. 1713 will be laid off rather than members of L.U. 2426. Thus, the union defendants will suffer harm, contrary to Plaintiffs' assertions. Further, if the seniority list advocated by Plaintiffs is utilized, the burden of job loss shifts entirely to the members of L.U. 1713.

Obviously, an injunction would not necessarily have this effect, especially if the injunction required U.S. Steel to not take any action until the matter was arbitrated. Nonetheless, it is important to understand the conflicting interests at work in this case. It is clear that Plaintiffs will suffer harm in the absence of an injunction. The merged seniority unit places a significant number of members of L.U. 1713 ahead of members of L.U. 2426. The layoffs scheduled to begin on September 16 will therefore affect the members of L.U. 2426 more profoundly than those of L.U. 1713. A permanent loss of employment is certainly irreparable harm, and Plaintiffs have shown that it will occur without an injunction.

Having found a clear showing of irreparable injury absent preliminary injunctive relief, the next step is to balance the likelihood of irreparable harm to Plaintiffs (from the failure to grant interim relief) against the likelihood of harm to Defendants (from the grant of such relief). *See Direx Israel, LTD.*, 952 F.2d at 812.

As earlier mentioned, it is Plaintiffs' position that Defendants will suffer little to no harm if an injunction is granted. Defendant U.S. Steel, however, disagrees and claims that employees will be laid off regardless of the issuance of an injunction. Therefore, U.S. Steel argues that the harm will inevitably fall on either members of L.U. 2426 or L.U. 1713. Furthermore, Defendant U.S. Steel will suffer harm if an injunction is issued. A designated representative, Mr. Durham, and Defendant U.S. Steel followed the collective bargaining agreement and the grievance procedure, the result of which was the resolution of the grievances filed by Plaintiffs and L.U. 1713. Merger of the seniority units, Defendant U.S. Steel argues, was done in reliance upon the validity and integrity of the settlements reached. Therefore, any injunction would invalidate at least one of the settlements. The harm, therefore, is "clear judicial intervention in the dispute resolution procedure of the Collective Bargaining Agreement." (Defendant U.S. Steel Mining Co., Inc.'s, Memorandum of Law, p. 4). In addition, "loss of the integrity of the dispute resolution procedures of the collective bargaining agreement is a very substantial harm which would be suffered by the Defendants should this Court issue the requested injunction." (Defendant U.S. Steel Mining Co., Inc.'s, Memorandum of Law, p. 5).

Obviously there will be harm to at least some of the Defendants if an injunction is granted. If this Court granted an injunction and required U.S. Steel to stay any action which would result in layoffs of any employees, U.S. Steel would suffer harm to its business. From testimony at the hearing on September 7, U.S. Steel has relied on the settlements reached and has gone forward with the physical merger of the two mines. Consequently, it has made business decisions and plans for operation of this single mine. Any injunction preventing it from proceeding with its "schedule" would assuredly result in harm. On the other hand, if this Court entered an injunction which prohibited the layoff of any member of L.U. 2426, Defendant U.S. Steel would suffer less harm since it could simply layoff members of L.U. 1713 and otherwise proceed as planned. Nevertheless, Defendant U.S. Steel would still suffer the harm from loss of the integrity of the grievance procedure, and loss in the "finality" of settlements reached in the grievance procedure. The most harm suffered under this scenario, however, would be by Defendant L.U. 1713 because it would suffer the loss of jobs as a result of the layoffs of its members.

The Court's application of the balance-of-hardship test has resulted in a balance of the scales. That is, the irreparable harm likely

to be suffered by Plaintiffs in the absence of an injunction is clear, however, so too is the likelihood of harm to the Defendants if an injunction is granted. The reality of this situation is that jobs are going to be lost due to a scaling back of the work force. The need for this scale-back has obviously resulted from two separate operating mines being merged into one single mine. With only a single mine operating where there once were two, certain job positions will be eliminated so as not to duplicate those positions. This poses a very unfortunate situation, to say the least. This geographical area has certainly seen its share of cut-backs and layoffs in the mining industry. Because such a large number of the people in this area have worked in the mining industry for most of their lives, these cut-backs and layoffs are all the more devastating. Therefore, this Court's conclusion that the harm to be suffered is equal to all parties is not meant to belittle the harm which mine employees will suffer if laid off. It simply is a legal conclusion reached after a review of the facts and circumstances of this case.

The next step, then, is to evaluate the likelihood that Plaintiffs will succeed on the merits of their claim. Plaintiffs alleged in their complaint that the manner in which Mr. Durham settled the grievances of L.U. 1713 and L.U. 2426 amounted to a breach of the Union's duty of fair representation and thus a breach of the collective bargaining agreement. Before Plaintiffs presented their case at the hearing on September 7, 1994, the Court announced that the focus of the hearing needed to be on whether there was a breach of the duty of fair representation. After reviewing the pleadings submitted up to the time of the hearing, the Court decided that such a focus would enable it to properly assess the application for a preliminary injunction. The likely harm to be suffered had already been discussed at some length in the pleadings. Therefore, it was the Court's conclusion that evidence supporting Plaintiffs' claim of breach of the duty of fair representation needed to be examined. Now, after the hearing and thorough review of the post-hearing memoranda submitted by all parties, this Court adheres to its prior finding that an

evaluation of Plaintiffs' likelihood of success on the merits is in order.

In support of the merits of their claim, Plaintiffs argue the case of *Local 1829 v. Island Creek Coal Co.*, 831 F.Supp. 553 (N.D.W.Va.1993) (Case No. 88–31). In that case, the district court upheld the arbitrator's decision approving a "dovetailing" system for the merger of seniority units which mirrors the system Plaintiffs advocate in this case. Plaintiffs argue that Mr. Durham's refusal to apply the decision in Case No. 88–31 was arbitrary and done so in bad faith. (Plaintiffs' Memo in Support of Injunctive Relief, p. 20). Plaintiffs have not shown, however, that Mr. Durham was under any sort of duty or obligation to apply that decision to the grievances in this matter. At the hearing it was pointed out by Defendants that the applicable collective bargaining agreement, Art. XXIII Section (k), provides that all decisions of the Arbitration Review Board rendered prior to the expiration of the National Bituminous Coal Wage Agreement "continue to have precedential effect[.]" Thus, only Arbitration Review Board Decisions have precedential effect. The decision Plaintiffs claim Mr. Durham had a duty to apply, however, is not an arbitration review board decision. Even if it was an Arbitration Review Board Decision, it was not rendered before the expiration of the NBCWA. Therefore, Plaintiffs' argument that Mr. Durham was bound by the decision and agreement in Case No. 88–31 is erroneous. Furthermore, Plaintiffs' argument that Mr. Durham "purposely and intentionally refus[ed] to consider" the 88–31 decision is not supported by the evidence. The evidence adduced at the hearing, as more fully developed on the record, shows that Mr. Durham was aware of the 88–31 decision, but that his conclusion was that he was bound by a different arbitration decision and that the circumstances he faced required the method agreed upon in the settlement of the grievances. The decision Mr. Durham did rely upon, Arbitration Review Board (Decision 78–31), also dealt with a merger of seniority units. This decision was obviously one from the Arbitration Review Board and was rendered before the expiration of the NBCWA. Thus, it appears that Plaintiffs' claim that Mr. Durham breached a duty of

fair representation by failing to apply the 88–31 decision is not likely to be successful.

Plaintiffs also argue Mr. Durham settled the grievances as he did because of his status as an elected representative and because the larger voting pool came from L.U. 1713. These assertions that Mr. Durham was operating under a bias or for personal reason are not supported by the evidence. In fact, the testimony of Mr. Durham at the preliminary injunction hearing revealed that he at all times acted in good faith and sought to remedy the difficult situation with which he was presented as fairly and as impartially as he knew how. Plaintiffs largely contend that because Mr. Durham entered into an agreement which settled the grievances in a manner which was more favorable to L.U. 1713, that he acted arbitrarily and capriciously. Further, Plaintiffs assert that the settlement of the grievance of L.U. 2426 before it went to arbitration was arbitrary, discriminatory and in bad faith. In response to Plaintiffs' arguments, the Defendants cited the language of the collective bargaining agreement which dealt directly with settlement of grievances. The applicable portion of the agreement, Art. XXIII Section (e) provides that "[a]n earnest effort shall be made to settle differences at the *earliest* practicable time." (emphasis added). Mr. Durham also testified at the hearing that he was aware of that provision in the agreement and that is why he settled the grievances, even after the grievance of L.U. 2426 had been scheduled to be arbitrated. Mr. Durham admitted that he thought there was merit to the grievance of L.U. 2426. Nevertheless, he testified (as more fully developed on the record) that he felt that the agreement he reached in the negotiated settlement with Defendant U.S. Steel was the best possible solution to the problem.

In spite of the Defendants' arguments and the testimony of Mr. Durham, Plaintiffs continue to assert that the duty of fair representation was breached. A review of the case law dealing with the duty of fair representation reveals the type of evidence required to establish such a breach. In *Ash v. United Parcel Service, Inc.*, 800 F.2d 409, 411 (4th Cir.1986), the court announced that "[t]he resolution of a grievance under a contractually established scheme is ordinarily final and binding on the parties." Thus, to overturn a decision reached during the grievance procedure, the complainant must "establish that the union handled his grievance perfunctorily or in bad faith and that there is substantial reason to believe that a union breach of duty contributed to an erroneous outcome in the contractual proceedings." *Id.* (citations omitted). The court further explained that "[s]imple negligence, ineffectiveness, or poor judgment is insufficient to establish a breach of the union's duty ... [,] [r]ather, the union's conduct must be grossly deficient or in reckless disregard of the member's rights." *Id.* (citations omitted). In *Ash*, the plaintiff was a former employee who had been discharged. Because his discharge was upheld through the third step of the grievance procedures defined by the relevant collective bargaining agreement, he sought judicial relief claiming that his union breached its duty of fair representation. Summary judgment was granted against him. *Id.* at 410.

In a United States Supreme Court case, the breach of the duty of fair representation was said to be breached "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). In *Vaca*, the plaintiff filed suit against his national union and the local union claiming he had been discharged from employment in violation of the collective bargaining agreement and that the union had arbitrarily refused to take his grievance to the fifth step of the bargaining agreement's grievance procedure. *Id.* at 173, 87 S.Ct. at 908. The Supreme Court recognized that a "union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion[.]" *Id.* at 191, 87 S.Ct. at 917. Nevertheless, the Supreme Court also found that the individual employee does not have an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement. *Id.* The court observed that the grievance process itself operates on the assumption that all will endeavor in good faith to settle grievances short of arbitration. Further, if an employee

could compel arbitration of a grievance regardless of its merit, the settlement machinery would be undermined and the employer's confidence in the union's authority to settle would be destroyed. Therefore, the Supreme Court held that "a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled the grievance short of arbitration." *Id.* at 192, 87 S.Ct. at 918. In a Ninth Circuit case, the court similarly held that a union representative must have some sort of discretion when representing its members. In *Hardcastle v. Western Greyhound Lines*, 303 F.2d 182 (9th Cir.1962), the court stated that "[a]n essential element, then, necessary to raise a limitation upon a union's discretion in bargaining with respect to seniority rights is a bad faith motive, an intent to hostilely discriminate against a portion of the union's membership."

It is clear, therefore, that Plaintiffs in this action carry a heavy burden in their endeavor to show that the union, Mr. Durham, breached its duty of fair representation. Plaintiffs cite the case of *Lewis v. Tuscan Dairy Farms, Inc.*, 752 F.Supp. 116 (S.D.N.Y.1990), in support of its argument that the duty of fair representation was breached. In *Lewis*, the union representative was found to have breached that duty. However, the facts of that case are distinguishable from this case. In *Lewis*, the union representative totally refused to even process a grievance in connection with a merger. In fact, the union representative admitted that he simply ignored the governing contract and did not even seek a merger of the seniority lists. *Id.* at 119. Plaintiffs in no way can argue here that Mr. Durham refused to process their grievance, largely due to the fact that they admit their grievance progressed through step 3 of the grievance procedure. Furthermore, Plaintiffs can not honestly argue that Mr. Durham ignored the applicable provisions of the collective bargaining agreement in light of the testimony received at the September 7 hearing and due to the procedures he followed in settling the grievances.

Notwithstanding the distinguishable facts, the same standards are set forth in *Lewis* as those in the above-mentioned case law with regard to the duty of fair representation and the proof required to show its breach. In a discussion of the duty of a union representative, the court recognized that a "collective bargaining agent may be called upon to compromise some rights in the interest of securing others, and thereby necessarily to make choices that affect some employees favorably, and others unfavorably." *Id.* at 123. That discretion, so long as it is exercised in good faith, is often necessary when making decisions based on seniority, nature of work and the like. *Id.* The *Lewis* case cites another Supreme Court case, *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), which held that a union representative negotiating a seniority clause must be allowed a wide range of reasonableness, even though differences would inevitably result in the manner in which different classes of employees would be affected.

In this case, Plaintiffs' only evidence that Mr. Durham acted with bad faith or hostility toward the members of L.U. 2426 is that the result adversely affected them. As earlier stated, however, this dispute was incapable of being resolved without one group of employees being adversely affected. Also, Plaintiffs argue that the decision to withdraw their grievance before arbitration was made arbitrarily, in bad faith and in an effort to preserve the interests of L.U. 1713 and harm those of L.U. 2426. These allegations, however, are unsupported by the evidence produced thus far. At the hearing on September 7, the Plaintiff representative admitted that it was not uncommon to withdraw a grievance or settle it before arbitration.

It is important to consider in this analysis of the likelihood of Plaintiffs' success on the merits of their claim whether the contractual rights of Plaintiffs were protected in the grievance procedure. Plaintiffs continue to argue that Mr. Durham was seeking the best deal for L.U. 1713 and that is the reason he settled the grievance and withdrew the grievance of L.U. 2426. This argument is an easy one to make under these circumstances, but the accuracy of it is highly susceptible to

criticism. Of course, it appears that L.U. 1713 received "the better deal" because the settlement provided for so many of its members to be placed at the top of the merged seniority unit and so many of the L.U. 2426 members were at the bottom. However, the No. 50 mine had been in operation for ten years longer than the No. 51 mine. Consequently, many of the members of L.U. 1713 had worked longer than those of L.U. 2426. If Plaintiffs had succeeded in their grievance and received their desired result, members of L.U. 2426 with less seniority would have been ahead of members of L.U. 1713 with more seniority. Of course, L.U. 1713 did not want this result. Defendants District 29, L.U. 1713 and Joe Sparks, in their post-hearing memorandum, argue that Mr. Durham found himself in an unfortunate situation of attempting to settle the matter in a manner fairest to all of the membership. That settlement, Defendants assert, while falling short of the desires of both the local union, was nonetheless proper under the terms of the collective bargaining agreement.

There is no dispute that such a merger of two separate mines into one common operating mine is the prerogative of the employer. (Arbitration Review Board Decision 78–31, p. 14). Arbitration Board Decision 78–31 provides principles to be followed when operating units and their constituent seniority units have to be merged. The principles applicable to this case include the following:

> [W]here such consolidations occur and are put into operation, and the employees at each of the constituent operations are continued in employment at their usual jobs for the most part as an integral part of the continuing consolidated operation, then the seniority of those employees must be accounted for and protected by preserving, to the extent practicable, that seniority in the consolidated operation.

> In such instances, such recognition and protection of seniority is most likely to be accomplished by some form of merger of the constituent seniority units into one combined common unit. In such circumstances, the length of service earned by the constituent employees at the constituent mines or operations must, under the terms of the National Agreement, be preserved.

> In making judgments concerning the validity of any such mergers of seniority units, in terms of the requirements of the National Agreement, the standard should be that each employee is credited with seniority in the consolidated common unit on the basis of his length of service earned at his constituent mine or operation and that any "dove-tailing" system utilizing such credited length of service does not, under all the circumstances shown, unreasonably adversely affect an unreasonably large number of employees.

(Arbitration Review Board Decision 78–31, p. 13–14). While testifying at the September 7 hearing, Mr. Durham stated that he reviewed arbitration decisions and did feel as though he was bound to follow the dictates of ARB Decision 78–31. Plaintiffs argue that the settlement of their grievance resulted in their seniority rights being unreasonably adversely affected. There is no question that their seniority rights were adversely affected. Whether the adverse affect was unreasonable in light of all the circumstances, however, is not so easily discerned. The Court's obligation to review the facts and determine whether there was a breach of the duty of fair representation does not include the duty to determine whether the final decision reached was the best decision. Case law has long provided that when the judiciary steps into the labor arena and begins to review the decisions of union officials on whether collective bargaining agreements have been enforced and rights protected, caution not to substitute the judgment of the court for that of the labor officials must be exercised.

Without substituting its judgment for that of Mr. Durham in this matter and without rendering a decision on the merits of Plaintiffs' case, the Court must determine whether Plaintiffs have made a strong showing of likelihood of success.. After a careful review of the pleadings, the evidence adduced at the September 7 hearing, and the post-hearing memoranda, this Court concludes that Plaintiffs have not shown a strong probability of success on the merits of their claim.

The fourth and final factor to be considered under the *Blackwelder* analysis is the public interest. Plaintiffs argue that the public interest lies in fostering arbitration and, therefore, injunctive relief should be granted so that the status quo will be maintained pending arbitration of the grievance of L.U. 2426. Defendants, however, argue that public policy mandates that the settlements arrived at between U.S. Steel and the union representative through good faith application of the dispute resolution procedures announced in the contract be upheld as final and binding. The Court agrees that the public interest does lie in enforcing the settlements reached in the grievance procedure. Article XXIII Section (h) of the collective bargaining agreement states that "[s]ettlements reached at any step of the grievance procedure shall be final and binding on both parties and shall not be subject to further proceedings under this Article except by mutual agreement." Of course, any settlement reached must be free of bad faith, hostility toward union members or discrimination. From the analysis thus far, the presence of such factors has not been shown.

For the above-stated reasons and those more fully developed on the record of the hearing held on September 7, 1994, IT IS ORDERED that Plaintiffs' application for a preliminary injunction is DENIED.

Defendant U.S. Steel, in its answer and counterclaim, requests this Court grant it injunctive relief by enforcing the terms under which the grievances were resolved. Also, in its post-hearing memorandum, Defendant U.S. Steel seeks declaratory relief. In essence, it seeks to have this Court declare that the settlements reached with regard to each of the grievances in this case constitute final and binding resolutions of the issues encompassed within them. This Court finds that a grant such relief at this time would be premature. Such a declaration would equate to a decision on the merits of Plaintiffs claims. The only determination made by this Court is that Plaintiffs failed to meet the four factors required for interim injunctive relief. As earlier stated, the Court is not rendering a decision on the merits at this time. Without going into an analysis of whether Defendant U.S. Steel has met the requirements to receive injunctive relief, the Court finds that the facts do not support such a request. There has been no evidence, other than the fact that Plaintiffs filed this action, that the settlements reached will not be followed by Plaintiffs. Accordingly, IT IS ORDERED that Defendant U.S. Steel's application for a preliminary injunction and/or declaratory relief is DENIED.

The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.